IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

WILDGRASS OIL AND GAS COMMITTEE,

        Plaintiff

v.

STATE OF COLORADO; JARED S. POLIS, in his official capacity as Governor of the State of Colorado; COLORADO OIL AND GAS CONSERVATION COMMISSION; and JEFFREY ROBBINS, in his official capacity as Acting Director of the Colorado Oil and Gas Conservation Commission,

        Defendants.

---

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

---

Plaintiff WILDGRASS OIL AND GAS COMMITTEE brings this action against defendants STATE OF COLORADO (the "State"); JARED S. POLIS, in his official capacity as Governor of the State of Colorado (the "Governor"); COLORADO OIL AND GAS CONSERVATION COMMISSION ("COGCC"); and JEFFREY ROBBINS (the "Director"), in his official capacity as Acting Director of the Colorado Oil and Gas Conservation Commission; and in support of its claims states as follows:

### NATURE OF THE ACTION

1. This case challenges the Constitutionality of C.R.S. §34-60-116 (the "Act"), which allows the COGCC to provide private companies access to Colorado residents' minerals without the owner's consent, and even when the mineral owner objects.

2. After sustained participation in COGCC administrative processes and proceedings over countless hours spanning almost two years, Plaintiff's members who own minerals ("Wildgrass Owners") have received an election letter requiring that they either elect to voluntarily participate in the large-scale residential fracking project or have their minerals pooled into the project and suffer a hefty penalty despite their myriad objections to the residential fracking project.

3. In reliance on the Act, and the rules promulgated by the COGCC (the "COGCC Rules"), the COGCC and the Director consistently "rubber-stamp" requests by private corporations for orders granting them access to the minerals of non-consenting mineral owners and penalizing non-consenting owners in violation of the United States Constitution.

4.   The Act, on its face, and as applied by Defendants:

    a.   Allows the COGCC to not only access the non-consenting owners' minerals, but does so for the benefit of a private corporation, and without protection of the mineral owners' substantive and procedural due process rights.

    b.   Interferes with Wildgrass Owners' right to freedom of association, and allows unlawful trespass.

    c.   Interferes with Plaintiff members' right to freedom of association.

    d.   Impairs the right to contract.

5.   The continued implementation and enforcement of the Act constitutes an imminent and ongoing threat by the State of Colorado, acting by and through the Defendant as Jeffrey Robbins as Acting Director of the COGCC.

6.   The Wildgrass Owners are entitled to declaratory and injunctive relief holding that the Act is unconstitutional and enjoining Defendants from enforcing the Act.

## JURISDICTION AND VENUE

7.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because the matter in controversy arises under the laws and Constitution of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and 42 U.S.C.§ 1983. Plaintiff seeks injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.   This action is brought pursuant to the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983 for declaratory and injunctive relief, for the purpose of protecting the associational rights of members.

9.   Venue rests properly in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) both because all Defendants reside in the State of Colorado and because all events giving rise to the claims herein occurred in Colorado.

10.   The Eleventh Amendment to the United States Constitution does not deprive this Court of jurisdiction because only injunctive and declaratory relief is sought.

## PARTIES

### A.  Plaintiff

11.   The Wildgrass Oil and Gas Committee ("Wildgrass OGC") members include mineral owners in the Wildgrass subdivision in Broomfield, Colorado which is one of the neighborhoods affected by the pending oil and gas operations described herein. As such, the Wildgrass Owners filed protests in accordance with the COGCC rules and regulations. The Wildgrass OGC is an independent organization which assists its members as they attempt to ensure that gas and oil development in their community is done responsibly consistent with applicable rules, regulations, laws, court decisions, and citizen's rights under the State and Federal constitutions.

**B.  Defendants**

12.     Defendant COGCC is the state agency responsible for administering the Act and for the protection of the health, safety and welfare of the people of Colorado from the health and safety risks of oil and gas operations, including the environment and wildlife resources, in the Commission's implementation and enforcement of the Act.

13.     Defendant Jared S. Polis is the Governor of the State of Colorado, and is required by the Colorado Constitution to ensure that all laws of the state are faithfully executed.  COLO. CONST. ART. IV § 2. As Colorado's Chief Executive, the Governor is the proper defendant to actions to enjoin or invalidate the application of the Act. *Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008).

14.     Defendant Jeffrey Robbins is the Acting Director of the COGCC, and in that official capacity, he is responsible for the implementation and enforcement of the Act, which is accomplished largely through the COGCC Rules. As described herein, Defendant Robbins is responsible for the administration, regulation, and enforcement of the Colorado Oil and Gas Conservation Act. Defendant Robbins is sued in his official capacity.

15.     The State of Colorado, operating through legislative action, adopted and revised the Drilling Units-Pooling Interests section of the Act. C.R.S. §34-60-116. The statutory mandates in the Act are forbidden by the U.S. Constitution.

## PROCEDURAL POSTURE, BACKGROUND, AND FACTUAL ALLEGATIONS

**A.      The Rule of Capture**

16.     Under the rule of capture, a lessee under an oil and gas lease acquires title to the oil and gas that it produces from drilled wells, even though part of the minerals have migrated from adjoining lands.

17.     The premise is based upon the fact that oil and gas have the power and the tendency to escape across property lines without any action or consent by the owner.

18.     Hydraulic fracturing, however, especially when horizontal drilling is employed, is distinguishable from the conventional methods of oil and gas extraction that gave rise to the rule of capture.

19.     Hydraulic fracturing is a well stimulation technique in which rock is fractured by a pressurized liquid. The process involves the high-pressure injection of 'fracking fluid' (primarily water, containing sand or other proppants suspended with the aid of thickening agents) into a wellbore to create cracks in the deep-rock formations through which natural gas, petroleum, and brine will flow more freely. When the hydraulic pressure is removed from the well, small grains of hydraulic fracturing proppants (usually either sand or aluminum oxide) hold the fractures open.

20.     The rule of capture assumes that oil and gas originate in subsurface reservoirs or pools, and can migrate freely within the reservoir and across property lines, according to changes in pressure. Modern day horizontal hydraulic fracturing, however, differs dramatically from

conventional gas drilling, in that it accesses natural gas that is trapped in the rock formations, *i.e.,* is non-migratory in nature and specific tracts must be specifically targeted for extraction.

21.    Put another way, the product does not merely escape to adjoining land absent the application of an external force. Instead, the shale must be fractured through the process of hydraulic fracturing; only then does the natural gas contained in the rock formations move through the artificially created channels.

22.    Another distinction from conventional drilling is that current technologies allow an operator to drill at least two miles horizontally in any direction from the well pad, which allows the operator to purposely target the minerals of others, including those that do not consent to having their minerals extracted.

23.    The rule of capture applies in all jurisdictions until modified by state law.

24.    When production practices are regulated by a state administrative agency charged with the prevention of waste and the protection of mineral owners' rights, such as is the case here with the COGCC, the rule of capture may be modified and limited by regulation.

## B.    The Act

25.    The Colorado General Assembly has adopted legislation that modifies the rule of capture in the Act via sections C.R.S. §34–60–101 *et seq.*

26.    In the Act and COGCC Rule 503, the legislature and COGCC have codified a process called "pooling."

27.    Pooling occurs when various parcels or interests are combined for purposes of mineral extraction so that costs and revenues are apportioned among the interest holders. C.R.S. § 34–60–116(6).

28.    Pooling may be voluntary or involuntary under the Act and COGCC Rules.

29.    Involuntary, or forced, pooling is often used as a hammer to require reluctant mineral owners to lease their minerals.

30.    Once rare, forced pooling is now much more common because of the large 640-acre to 1,280-acre drilling units that are being developed through horizontal drilling.

31.    The law in Colorado allows forced pooling if operators own or have leased *any* acreage within the relevant drilling unit. Thus, operators can force pool multiple neighborhoods and thousands of people even if they directly have access to only one acre.

32.    While the COGCC does not require operators to report the number of people that they force pool, and does not itself publish this information, Plaintiff estimates that at least 30,000 mineral owners were force pooled in 2018 alone.

33.    The process to allow for forced pooling in Colorado requires only that the unleased mineral owner be given a "reasonable" offer, which is a vague and undefined term.

34.    The Act gives the COGCC sole discretion to determine whether an offered lease is "reasonable," the only guideline being that the terms should be "no less favorable than those currently prevailing in the area."

35.    COGCC Rule 530b(2) indicates that COGCC will consider the following factors to determine whether a lease is reasonable:  (1) Date of lease and primary term or offer with acreage in lease; (2) Annual rental per acre; (3) Bonus payment or evidence of its non-availability; (4) Mineral interest royalty; and (5) Such other lease terms as may be relevant.

36.    In reality, however, the COGCC routinely grants forced pooling applications so long as the operator can show that it was able to convince any mineral owners in the space to sign the lease at issue. Given the real threat of force pooling, this is not a fair test of the reasonableness of a lease.

37.    A mineral owner is considered non-consenting, and therefore will be forced pooled, if they do not lease (or become an active or passive working interest owner) after receiving notice at least 60 days before the COGCC hearing on the operators' pooling application.

38.    The only recourse the non-consenting mineral owners have is to hire an attorney and protest the pooling application to the COGCC. This abuse of the state process is allowing operators to strong arm mineral owners into signing poor leases under duress.

39.    The private corporations that are benefitting from force pooling are provided with the means to conduct a government taking, but without due process and without just compensation.

40.    In fact, the Act not only allows private companies to access the mineral owner's property, it severely penalizes any non-consenting mineral owners by:

    a.  Allowing the private gas and oil operators to recover from the non-consenting owner's share of production:

        i.  <u>One hundred percent</u> of the non-consenting owner's share of the cost of surface equipment beyond the wellhead connections, including stock tanks, separators, treaters, pumping equipment, and piping, <u>plus one hundred percent</u> of the non-consenting owner's share of the cost of operation of the well or wells commencing with first production and continuing until the consenting owners have recovered such costs; and

        ii.  <u>Two hundred percent</u> of that portion of the costs and expenses of staking, well site preparation, obtaining rights-of-way, rigging up, drilling, reworking, deepening or plugging back, testing, and completing the well, after deducting any cash contributions received by the consenting owners, <u>and two hundred percent</u> of that portion of the cost of equipment in the well, including the wellhead connections.

    b.  Fixing the non-consenting owners' proportionate royalty at twelve and one-half percent until such time as the consenting owners recover, only out of the non-consenting owner's proportionate seven-eighths share of production, the costs specified above.

41.     After recovery of the costs specified above (the "Penalties"), the non-consenting owner then is deemed to be a "working interest owner" whereby, despite any objections to the project, they own their proportionate share of the wells, surface facilities, and production and are liable for further costs as if the owner had originally agreed to drilling of the wells.

42.     Put simply, the Act supports operators in forcing mineral owners to either accept offered lease terms or have their minerals taken with deep penalties and, worse, be considered a working interest owner in the project regardless of their health, safety, environmental, or economic concerns.

## C.     Actions Before COGCC

43.     June 24, 2016 - Extraction Oil & Gas, Inc. ("Extraction") through its land man, High West Resources Ltd., sent an unreasonable lease offer to mineral owners in Broomfield, including the Wildgrass Owners.

44.     June 30, 2016 - Extraction filed applications with the COGCC asking that the COGCC vacate its prior Order Nos. 467-8, 499-15, and 407-87 as they pertain to Extraction's proposed oil and gas development in Broomfield, and create six spacing units, whereon Extraction proposed to drill up to 120 horizontal wells from four well mega-pads in City and County of Broomfield ("Broomfield") residential areas (the "Proposed Residential Fracking Project"):

   a.   Lowell South Drilling Spacing Unit ("Lowell South DSU) - Docket No. 160800350[1] – requested up to 20 wells and an approximately 1,600-acre spacing unit in Broomfield County, Colorado.

   b.   Lowell North Drilling Spacing Unit ("Lowell North DSU") - Docket No. 161200489 – requested up to 20 wells and an approximately 1,600-acre spacing unit, in Broomfield County, Colorado.

   c.   Sheridan North Drilling Spacing Unit ("Sheridan North DSU") - Docket No. 161200490 and 160800349 – requested up to 20 wells and an approximately 1,600-acre spacing unit in Adams and Broomfield Counties, Colorado.

   d.   Sheridan South Drilling Spacing Unit ("Sheridan South DSU") - Docket No. 160800362 – requested up to 20 wells and an approximately 1,600-acre spacing unit in Adams and Broomfield Counties, Colorado.

   e.   United South Drilling Spacing Unit ("United South DSU") - Docket No. 160800352 - requested up to 20 wells and an approximately 1,280-acre spacing unit in Adams and Broomfield Counties, Colorado.

   f.   Huron South Drilling Spacing Unit ("Huron South DSU") - Docket No. 161000476- requested up to 10 wells and an approximately 1,920-acre spacing unit in Adams and Broomfield Counties, Colorado.

   g.   Huron North Drilling Spacing Unit ("Huron North DSU") - Docket No. 161000469 - requested up to 10 wells and an approximately 640-acre spacing

---

[1] Unless otherwise indicated, "Docket No." refers to a COGCC docket number.

unit in Adams and Broomfield Counties, Colorado.

45.     Cumulatively, the eight spacing units requested 120 wells on 10,240 acres. This represents the largest combined drilling project in the history of Broomfield and the scale of the project is remarkable for both the total number of wells and acreage in comparison to other projects considered by COGCC, and for the health and safety concerns triggered by the close proximity to residential subdivisions in an urbanized area approximately 20 miles north of Denver.

46.     The Lowell South DSU includes most directly affects Wildgrass Owners.

47.     July 2016 – the Wildgrass HOA formed a committee to address proposed residential oil and gas development in the community, Wildgrass OGC, to assist Wildgrass mineral owners with the issues surrounding oil and gas development in Broomfield and residential oil and gas development proposals in Broomfield.

48.     July 13, 2017 – Extraction filed new spacing applications with COGCC, including Docket No. 170900598 ("598") to establish the Lowell South DSU as an approximate 1,600-acre drilling and spacing unit with up to 20 horizontal wells, and at least six other spacing applications with up to 110 wells for a total of up to 130 wells (the "Amended Residential Fracking Project").

49.     August 24, 2017 – CCOB filed a protest and intervention alleging, among other things, that:
   a.  The proposed spacing unit and wells would not result in efficient and economic development of the Codell and Niobrara Formations, and

   b.  The proposed development would adversely affect public health, safety and welfare.

50.     August 24, 2017 – Broomfield filed a request for a Local Public Forum regarding the pending spacing applications for the Amended Residential Fracking Project, including Docket No. 598.

51.     August 28, 2017 – the Wildgrass Owners, through counsel, filed a protest in Docket No. 598 alleging, among other things:

   a.  Wildgrass Owners did not receive proper notice under COGCC Rules 507.b(1) and 318A.e(5),

   b.  The proposed spacing unit would cause: i) waste and protection of correlative rights, and ii) danger to residents' health and safety and welfare,

   c.  The application did not reveal economic stability of Extraction, and

   d.  Current market conditions were not favorable for development.

52.     Docket No. 598 was continued to the Commission's October 2017 hearing.

53.     September 19, 2017 – Notice of Hearing for Docket No. 598 and 749 were allegedly sent for the Commission's October hearing in Denver. Extraction again used erroneous addresses

for Wildgrass Owners despite having notice of both the correct addresses as well as the Owners' representation by counsel.

54.    October 3, 2017 – prehearing conference with Extraction, Broomfield, and the Wildgrass Owners in Docket No. 170900596 (Lowell North, "596") and 749 (increased well density application).

      a.    Wildgrass Owners presented evidence that many Owners and their attorney had not been served with a hearing notice, nor the amended application in Docket No. 596 or the application in Docket No. 749,

      b.    Hearing Officer James Rouse declined to continue the matters, and required any protest on Docket No. 596 to be filed three days later on October 6th, which would also be ten days earlier than the deadline prescribed in COGCC's rules even if proper notice had been provided.

55.    On or about October 4, 2017, the Hearing Officer denied Broomfield and Wildgrass Owners' requests for discovery, and instead ordered Extraction to provide "full and complete disclosures" under C.R.C.P. 16 and 26.

56.    October 4, 2017 – Extraction requested, via email, a prehearing conference on Docket No. 598 and 749 for the following day – October 5th. Despite objections from counsel for the Wildgrass Owners and CCOB, this request was granted.

57.    October 5, 2017 – At the pre-hearing conference on Docket No. 598 and 749:

      a.    The Wildgrass Owners made an oral motion for a stay of proceedings for lack of notice, which was denied.

      b.    The hearing officer stated that arguments regarding health, safety, economics and efficiency were not relevant to a spacing application protest, and denied the Wildgrass Owners' and Broomfield's requests for discovery of related information.

      c.    The hearing officer denied the Wildgrass Owners' request for certain witness testimony.

      d.    The hearing officer set up tight pre-hearing deadlines under protest by both the Wildgrass Owners and Broomfield.

58.    October 6, 2017 – Extraction made only limited disclosures which did not comply with the C.R.C.P. requirements for full and complete disclosures.

59.    October 6, 2017 – Broomfield filed a protest and intervention regarding the Amended Residential Fracking Project, again alleging, among other things, that the proposed well density will not result in efficient and economic development of the Codell and Niobrara Formations and arguments relating to statutory interpretation of C.R.S. 34-60-116. Broomfield also reminded COGCC of the requirements of the Act, which requires the COGCC to ensure protection of the public health, safety, and welfare from oil and gas development activities.

60.     October 6, 2017 – Wildgrass Owners filed a protest to amended Docket Nos. 598 and 749 alleging, among other things, that it did not receive proper notice under Commission Rules 507.b(1) and C.R.S. 34-60-108(4), that the application did not specify the precise location of the proposed wells and well pad; and that the proposed wells would not be efficient, economic, prevent waste, nor protect correlative rights; and would be detrimental to residents' health and safety.

61.     October 12, 2017 – Despite its denial of Broomfield's request for a Rule 501 local public forum to discuss the large-scale residential drilling proposed for Broomfield, COGCC did participate in a public meeting regarding the Amended Residential Fracking Project, and residents once again voiced their health, safety and welfare concerns to COGCC.

62.     October 12, 2017 – Wildgrass Owners filed a Joint Emergency Motion to Continue Hearing for Docket NOS. 598 and 749 alleging, among other things, that:

    a.     Extraction had not complied with relevant notice requirements and thus the Owners in the space were not provided with due process, and

    b.     Extraction had not complied with the Hearing Officer's order that it provide the Wildgrass Owners with C.R.C.P. compliant disclosures.

63.     October 20, 2017 – Final Prehearing Conference, wherein Hearing Officer Rouse:

    a.     Denied the Emergency Motion to Continue holding that the Wildgrass Owners were not prejudiced by the lack of notice,

    b.     Denied Wildgrass Owners request for Extraction to provide proper C.R.C.P. compliant disclosures despite his prior order that they do so, and

    c.     Denied Wildgrass Owners request for discovery and for witnesses to appear at the Commission hearing.

## D.     Broomfield Operator Agreement

64.     October 24, 2017 – Broomfield voted to approve the Amended and Restated Oil and Gas Operator Agreement between Applicant Extraction and the City and County of Broomfield (the "Broomfield OA").

65.     The Broomfield OA requires that Extraction prepare and submit for approval by the Broomfield County Manager a Comprehensive Drilling Plan ("CDP"), with 23 specified sections on topics ranging from air quality, to noise control, and emergency preparedness and risk management.

66.     The Broomfield OA limits wells to be drilled by extraction to 84. Thus, the 120 total wells authorized by the Commission under the various spacing orders referenced, *supra*, are approximately 42.8% greater than the number authorized under the OA. The discrepancy between the COGCC approvals and the OA leave open the possibility that Extraction could seek future state approvals to drill the additional wells approved by state spacing orders, at future locations to be determined or proposed.

67.     The Broomfield OA enumerates 57 individual numbered paragraphs of BMPs on subjects ranging from Well Sites in ¶ 1 to possible Berms, Bales or Straw Walls in ¶ 57.

68.     A sampling of differences between the Broomfield OA and conditions in the 2As as approved by the Commission include, but are not limited to, the following provisions and subject headings in the OA for which parallel provisions are either absent or less stringent in the 2As: Quiet Technology (¶ 2), Use of Pipelines ((¶ 3), Containment Berms ((¶ 8), Closed Loop Pitless Systems for the Containment and/or Recycling of Drilling Fluids (¶ 9), Burning (11), Chemical Disclosure and Storage (¶ 13), Cultural and Historical Resource Protection (¶ 15), Discharge Valves (¶ 16), Emergency Preparedness Plan (¶ 19), Air Quality (¶ 20), Water Quality Monitoring Plan (¶ 26), Noise Mitigation (¶ 31), Flowlines (¶ 32), Plugged and Decommissioned Well Testing (¶ 36), Transportation and Circulation (¶ 40), Injection Wells (¶ 45), Odor (¶ 48), Reclamation (¶ 49), Well Integrity (¶ 50), Fires and Explosion (¶ 51), Spills (¶ 52), Bradenhead Monitoring (¶ 53), Variances (¶ 54), Risk Assessment (¶ 55), Automatic Safety Protective Systems and Surface Safety Valves (¶ 56).

69.     The Broomfield OA requires Extraction to submit 23 total plans to Broomfield, including several plans going to areas where state and local jurisdictional authority is overlapping or for which the state or operator may claim that the state has primary jurisdiction, on topics including Project Schedules, Reclamation, Noise Impact Mitigation Plan, Air Quality Impact Mitigation Plan, Emergency Response Preparedness Plan, Facility Emissions Inventories and Air Quality Impacts, Noise, Hazardous Materials Management Plan, Waste Management Plan, Water Quality Plan, Visual Mitigation Plan, and a Summary of the Outcome of the Alternative Site Analysis.

70.     These BMPs and other provisions were negotiated to protect Broomfield residents such as Wildgrass Owners, public health, safety, and the environment – in addition to Broomfield's strictly governmental, landowner, and mineral interests with regard to the Amended Residential Drilling Project.

**E.     Approval of the Lowell South Spacing Unit**

71.     October 31, 2017 – COGCC hearing on the pending spacing applications for the Amended Residential Fracking Project, including Docket Nos. 598 and 749.

   a.   Wildgrass Owners requested review of the hearing officer's decision to deny discovery and deny the motion for continuance.

   b.   The Commission approved the continuance of Docket Numbers 598 and 749 (as it relates to Lowell South SU) for good cause under COGCC Rule 506 on the basis that notice was not provided to the Wildgrass Owners.

   c.   The Commission, acting through a vote of the Commissioners, held that "Any applications for Permits to Drill (Form 2) or Oil and Gas Location Assessments (Form 2A) filed by Extraction Oil & Gas, Inc. in the unit on surface lands within the City and County of Broomfield will comport with the October 24, 2017 Amended and Restated Oil and Gas Operator Agreement between Applicant and the City and County of Broomfield."

    d.    Based on this representation, Broomfield withdrew its protest to the remaining spacing applications.

    e.    Many residents and another governmental entity, Adams County, made oral comments to COGCC regarding the health and safety concerns of the Amended Residential Fracking Project and requested a hearing on all the pending applications.

## F.    Approval of the Livingston Drilling Permits

72.    December 11, 2017 – the COGCC entered Order No. 407-2256 which, among other things, establishes an approximate 1,600-acre drilling and spacing unit for the Lowell South DSU, and approved the drilling of one horizontal well, for the production of the oil and associated hydrocarbons from the Codell and Niobrara Formations.

73.    December 11, 2017 – the COGCC entered Order No. 407-2274 which, among other things, allowed 19 additional horizontal wells, for a total of 20 wells, within each of two drilling and spacing units under Docket Nos. 596 and 598.

74.    The COGCC made no investigation or finding with regard to public health, safety, and welfare or the environment, nor efficiency, economy, or profitability in granting any of the spacing applications for the Amended Residential Fracking Project.

75.    In fact, the COGCC Commissioners spoke at length during the October hearing about the fact that mineral owners are not permitted by the COGCC Rules to present issues regarding health, safety, environment or even economic and efficiency concerns.

76.    As of December 11, 2017, when COGCC granted Extraction the requested spacing units, despite the large numbers of non-consenting mineral owners in the Lowell South DSU.

77.    December 17, 2017 – Extraction submitted the first draft of the CDP, which Broomfield rejected as non-compliant. Because the draft CDP was negotiated between Extraction and Broomfield and COGCC is not a party, it is not subject to COGCC Rule 216, Comprehensive Drilling Plans.

78.    January 1, 2018 – Despite the fact that Extraction did not yet have a CDP approved by Broomfield for the Lowell South DSU, Extraction submitted to the Commission its drilling permits for the Livingston pad (the "Livingston Drilling Applications"), which is the well pad Extraction proposed to hold 19 horizontal wells.

79.    January 26, 2018 – Extraction submitted a second draft of the CDP to Broomfield, which was also rejected.

80.    February 2018 – Wildgrass Owners submitted their complaint and protest to the Livingston Drilling Applications and requested a hearing regarding the Livingston Drilling Applications and the Amended Residential Fracking Project as a whole; specifically requesting that COGCC:

    a.    Deny the Livingston Drilling Applications until proper discovery is completed on the issues of profitability, viability, efficiency, and health and safety.

      b.   Grant one hearing to consider the entire Amended Residential Fracking Project, to ensure that this enormous residential project is viewed and considered in a holistic manner with comprehensive analysis of the project as whole rather than just looking separately at the component parts covered by individual drilling units and 2A requests, and the issues of economics, waste, efficiency, and health and safety are reviewed for the entire project.

      c.   Require that Extraction post a bond to guarantee that the existing and future Amended Residential Fracking Project wells will be properly plugged and abandoned by the operator.

81.    March 5, 2018 – Extraction submitted to the COGCC its drilling permits for the remaining pads in the Amended Residential Fracking Project: Interchange A, Interchange B, Northwest A, Northwest B, United A, and United B pads, all of which were approved in the same manner as the Amended Residential Fracking Project.

82.    April 17, 2018 – Extraction submitted a third draft of the CDP to Broomfield for staff review. Broomfield rejected this CDP because it was non-compliant with the requirements of the OA.

83.    May 11, 2018 – Extraction submitted another draft of the CDP to Broomfield, which was again rejected due to multiple deviations and deficiencies.

84.    May 29, 2018 – Having received no response from CCOGC with regard to their complaint and protest, Wildgrass Owners submitted official comments and reiterated their request for hearing to COGCC regarding the Livingston Drilling Applications and the Amended Residential Fracking Project, and specifically requested that COGCC:

      a.   Stay decisions on all of the drilling applications in the Amended Residential Fracking Project until proper discovery could be completed on the issues of economics, waste, efficiency, and health and safety.

      b.   Grant a simultaneous hearing on all of the Amended Residential Fracking Project applications, to ensure that this enormous residential project is analyzed holistically and comprehensively instead of a piecemeal approach, and the issues of economics, waste, efficiency, and health and safety are reviewed for the entire project.

      c.   Require that Extraction post a bond to guarantee that the existing and future wells in the Amended Residential Fracking Project will be properly plugged and abandoned.

85.    April 26, 2018 – Without a hearing, and without notice to any of the interested parties in the relevant spacing units, COGCC found that the review of Form 2A portion of Extraction's Livingston Drilling Applications was complete, despite the facts that:

      a.   Broomfield had still not reached an agreement with Extraction on the CDP,

b. The health, safety, and welfare concerns raised by Broomfield residents and Wildgrass Owners were not adequately considered or comprehensively addressed,

c. Extractions Form 2A submissions for the Livingston Drilling Applications did not comport with or include the Best Management Practices or Conditions of Approval in the Broomfield OA, despite the COGCC's October 30, 2017 decision that the Broomfield OA would be part of COGCC decisions approving development;

d. Extraction's Form 2A for the Livingston Drilling Applications did not comport with the applicable COGCC Rules or the Act.

86. June 1, 2018 – Without a hearing, and without notice to any of the interested parties in the relevant spacing units, COGCC found that the review of Form 2 portion of the Livingston Drilling Application review was complete, despite the flaws enumerated above for the Form 2A.

87. June 1, 2018 – The COGCC administratively granted thirteen drilling permits for the Livingston Pad (the "Livingston Drilling Permits"):

a. Without a hearing,

b. Without notice to mineral owners in the Lowell South DSU or their attorney,

c. Without considering or making a finding regarding the public health, safety, and environmental concerns related to the Livingston Drilling Applications and the Amended Residential Fracking Project,

d. Despite the complaint, protest, and comments from the Wildgrass Owners,

e. Despite the comments from the public and Broomfield urging the COGCC to consider serious health risks, and economic issues,

f. Despite the fact that Extraction did not own or hold leases for all of the minerals in the Lowell South DSU,

g. Despite the lack of an agreed-upon CDP between Broomfield and Extraction, and

h. Despite the fact that the Livingston Drilling Applications specifically, and the Residential Fracking Project in general, do not comply with the COGCC's Rules and the Act for multiple reasons, including but not limited to the failure to:

    i. implement mitigation measures in compliance with COGCC's Interim Statewide Horizontal Offset Well Policy,

    ii. prevent waste,

    iii. protect correlative rights,

    iv.   provide support that the project will be economic,

    v.   require an adequate bond given the special nature of this major project encompassing 140 wells in close proximity to hundreds of homes and despite recent evidence of catastrophic and fatal fires and explosion resulting from the failure of oil and gas operators to assure the safety of citizens and residents, and

    vi.   provide evidence related to public health, safety, and environmental issues.

88.    The COGCC did not require that the language and specific conditions in the Livingston Drilling Permits comport with the Broomfield OA despite the fact the COGCC had agreed to this requirement at the October 2017 hearing in exchange for Broomfield withdrawing its protest.

89.    Due to the nature of oil and gas law in the state of Colorado, including statutes and court decisions regarding preemption and the division of jurisdiction and oversight authority between the State acting through COGCC and local governments, there is substantial uncertainty as to the ability of Broomfield to fully, promptly, and effectively enforce all provisions in Broomfield OA and the CDP – including various important and material BMPs, COAs or other provisions that were not included in the COGCC decision approving Extraction's 2s and 2As. This raises serious questions about the potential impacts of the project to impacted residents and whether the COGCC is meeting its duty to protect public health and safety, and whether COGCC's failure to honor the commitment to make the Broomfield OA part of future COGCC approvals puts affected residents at risk from the contemplated oil and gas operations.

90.    The Wildgrass Owners and other Broomfield residents attended the June 30, 2018, COGCC hearing in an effort to convince the COGCC to consider the impact of the Livingston Drilling Permits and the Amended Residential Fracking Project to the public health and safety, and the environment, as well as issues concerning economics and efficiency, and to remind COGCC that there was no approved CDP with Broomfield, to no avail.

91.    On July 27, 2018, Extraction submitted a "Final" CDP to BBOC.

92.    Even before the CDP had been finalized, Broomfield was set to consider an agenda item on August 7, 2018 described as "Request for Executive Session to Receive Legal Advice and Provide Direction for Negotiations Regarding Extraction's Comprehensive Drilling Plan and Potential Litigation Related to the October 24, 2017, Operator Agreement." The recognition of potential litigation and legal issues arising before final Broomfield approvals, or the commencement of operations is cause for reasonable concern among Plaintiff's members and other impacted residents as to Broomfield's ability to fully and effectively enforce the OA or CDP, and thus assure that protections relied on by the COGCC in October 2017 will be enforceable by Broomfield.

93.    June 1, 2018  - Senate Bill 230 was signed into law which amended the Act to require operators to provide notice to mineral owners 60 days before any hearing on an application for a forced pooling order and ostensibly holds non-consenting mineral owners harmless for operating spills and accidents.

94.     July 17, 2018 - Extraction sent an election letter to the Wildgrass Owners insisting that they respond within 35 days and elect to either participate in the Livingston wells (actively or passively) or actively refuse to consent and be subject to a "200% non-consent penalty" (the "First Election Letter").

95.     The First Election Letter was deficient as least due to the following:

    a.  Despite the fact that SB 230 was already implemented into law, Extraction provided only 35 days to make an election;

    b.  The First Election Letter did not include a reasonable lease offer, and Extraction has, to date, never made a reasonable lease offer;

    c.  Mineral owners were not provided a full estimate of costs of the well pad, nor an estimate of their share of the estimated drilling and completion cost of the well, for instance, the included estimate did not include costs for a number of BMPs and other conditions to which Extraction agreed, including without limitation the pipelines for water, oil, gas and waste; as well as plugging and abandoning the wells;

    d.  The March 2019 spud date for the Livingston Pad was not realistic, especially given that Extraction agreed to drill the other pads in the Residential Fracking Project first, this date was not realistic.

    e.  While there was a table that purports to identify the location and depth of the wells, it only included data for 13 of the 19 proposed wells and was further so technical that no lay person could decipher the data;

96.     The First Election Letter estimated that drilling and completing just 13 of the 19 wells on the Livingston is $91,000,000, and this does not include all costs.

97.     Extraction has publicly reported that the required pipelines for the Residential Fracking Project will cost $500,000,000.

98.     Wildgrass Owners sent communications to Extraction identifying the deficiencies in the First Election Letter.

99.     Wildgrass OGC sent communications to Broomfield's Local Government Designee and to COGCC identifying the deficiencies in the First Election Letter. COGCC has never responded to these communications. Extraction responded with disdain and with a second election letter.

100.    August 27, 2018 - Extraction sent a second election letter to the Wildgrass Owners insisting that they respond within 60 days and elect either to either participate in Livingston wells or actively refuse to consent ("Second Election Letter").

101.    The Second Forced Pooling Election Letter remains deficient at least because:

    a.  The Second Election Letter did not include a reasonable lease offer, and Extraction has, to date, never made a reasonable lease offer;

b. Mineral owners were still not provided a full estimate of costs of the well pad, nor an estimate of their share of the estimated drilling and completion costs of the well;

c. The March-July 2019 date range for spudding the Livingston Pad was not realistic, especially given that Extraction agreed to drill the other pads in the Residential Fracking Project first, this is not realistic; and

d. The identification of the location and depth of the wells still only includes data for 13 of the 19 proposed wells and was so technical that no lay person could decipher the data.

102. August 31, 2018 - Extraction filed its application with the COGCC to force pool the Wildgrass Owners (the "Forced Pooling Application").

103. October 29 and 30, 2018 – the original date of the COGCC hearing wherein the Forced Pooling Application was to be heard.

104. The operator, Extraction, has repeatedly, and without articulating a cause, delayed the Wildgrass Owners from having a hearing on the Forced Pooling Application. The Forced Pooling Application was scheduled to be heard at the December hearing, then the January hearing, and most recently the March COGCC hearing.

105. At the eventual COGCC hearing the Wildgrass Owners' property will be taken by the COGCC for the benefit of a private corporation despite the Wildgrass Owners continued protest against the Residential Fracking Project based on issues concerning health, safety, welfare, and the environment, as well as concerns about the economics, efficiency, and invasion of correlative rights posed by the Project.

106. Extraction continues to proceed with the Amended Residential Fracking Project despite the fact that they have not obtained rights to access the Wildgrass Owners minerals, which is allowed by the Act and the COGCC rules.

## G.   Basis for Public Concern

### *The Berthoud Abandoned Well Incident*

107. October 2017 – prior to COGCC granting the Livingston Drilling Permits, an eruption of hydrocarbons and drilling mud occurred from an improperly abandoned oil and gas well near Berthoud, Colorado (the "Berthoud Incident").

108. Many of the at least 237 offset wells in proximity to the wells proposed in the Amended Residential Fracking Project pose similar risks.

109. Yet, the COGCC has not required mitigation measures or heightened inspection to protect public health and safety by preventing similar problems within the Amended Residential Fracking Project despite the fact that there are hundreds of offset wells – and thousands of occupied homes – within 3,000 feet of the Amended Residential Fracking Project.

110.   In fact, despite the fact that many of the existing offset wells in proximity to the Amended Residential Fracking Project were drilled in or before the 1990s, the COGCC did not require Extraction to prove the integrity of the cement and casings for those wells to identify any leaks or other safety risks.

### Health Concerns

111.   An array of threats to health, safety, property, and the environment have been associated with hydraulic fracturing operations.

112.   Such health threats include leaks of methane and volatile organic compounds ("VOCs") exacerbating ozone pollution; exposure to benzene, toluene, and other cancer causing chemicals in emissions from oil and gas operations; extreme noise and light pollution at all hours; destruction of water supplies;  permanently scarred landscapes; soil contamination;  road and other infrastructure destruction from enormous amounts of truck traffic, and other threats to public health, safety, property, and the environment, including risk of catastrophic explosions, fires, and the pollution from toxic substances used by first responders to combat such catastrophic events.

113.   Investigative articles abound discussing health issues caused by oil and gas development, including:

    a.   Witter, Roxana, *et al.*, *Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper*, University of Colorado Denver, Colorado School of Public Health (Sept. 15, 2008);

    b.   Finkel, Madelon and Law, Adam, *The Rush to Drill for Natural Gas: A Public Health Cautionary Tale*, 101(5) AM J PUBLIC HEALTH 784–85 (May 2011);

    c.   Colburn, Theo, *et al.*, *Natural Gas Operations from a Public Health Perspective*, 17 HUMAN AND ECOLOGICAL RISK ASSESSMENT 1039–56 (Sept. 2011);

    d.   McKenzie, Lisa M., et al., *Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources*, SCIENCE OF THE TOTAL ENVIRONMENT (2012);

    e.   Kassotis, C. D., *et al.*, *Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region*, 155(3) ENDOCRINOLOGY 897–907 (Jan. 1, 2013);

    f.   Finkel, M. L., *et al.*, *Modern Natural Gas Development and Harm to Health: The Need for Proactive Public Health Polices*, 2013 ISRN PUBLIC HEALTH, available at http://dx.doi.org/10.1155/2013/408658;

    g.   Steinzor, Nadia, *et al.*, *Investigating Links Between Shale Gas Development and Health Impacts Through a Community Survey Project in Pennsylvania*, 23(1) NEW SOLUTIONS 55–83 (2013);

h.   Webb, Ellen, *et al.*, *Developmental and Reproductive Effects of Chemicals Associated with Unconventional Oil and Natural Gas Operations*, 29(4) REV ENVIRONMENTAL HEALTH 307–18 (2014);

i.   McKenzie, Lisa M., *et al.*, *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado*, 122 ENVIRONMENTAL HEALTH PERSPECTIVE 412–17 (Jan. 28, 2014);

j.   Macey, Gregg P., *et al.*, *Air Concentrations of Volatile Compounds Near Oil and Gas Production: A Community Based Exploratory Study*, ENVIRONMENTAL HEALTH (Oct. 30. 2016);

k.   Haley, Marsha, *et al.*, *Adequacy of Current State Setbacks for Directional High-Volume Hydraulic Fracturing in the Marcellus, Barnett, and Niobrara Shale Plays*, 124(9) ENVIRONMENTAL HEALTH PERSPECTIVES 1323–33 (Sept. 2016), *available at* https://ehp.niehs.nih.gov/15-10547/;

l.   Hays, Jake, *et al.*, *Public health implications of environmental noise associated with unconventional oil and gas development*, 580 SCIENCE OF THE TOTAL ENVIRONMENT 448–56 (Feb. 15, 2017).

114.   The Concerned Health Professionals of New York (CHPNY), an initiative by health professionals, scientists, and medical organizations for raising science-based concerns about the impacts of oil and gas development on public health and safety, has published five annual editions of a fully referenced compilation of the evidence outlining its risks and harms (the "Compendium"). The Compendium is a public, open-access document that is housed on the websites of Concerned Health Professionals of New York (www.concernedhealthny.org) and Physicians for Social Responsibility (www.psr.org).

115.   Local scientists have repeatedly presented evidence to the Commission of the negative health effects of oil and gas development.

116.   On May 12, 2018, Dr. David Nolan, a Broomfield-based gastroenterologist, published a summary of conclusions based on his review of peer-reviewed medical and public health studies of the health risks to residents living within proximities of up to 2,500 feet from hydraulic fracturing operations. Dr. Nolan wrote that all the studies he reviewed "show significant medical risk." He references "well written and well powered retrospective studies demonstrating increased risk for low birth weight infants, asthma exacerbations as well as nose

bleeds, psychiatric and gastrointestinal illnesses." *See* https://broomfieldconcerned.org/community-blog/a-local-doctors-take-on-the-dangers-of-oil-and-gas-development-in-our-neighborhoods/.

117.   Dr. Nolan's meta survey included a finding of up to four-fold increase in the risk of acute lymphocytic leukemia in people living within 1000 ft of oil and gas operations. This has been backed up by a study from the University of Colorado showing an eight-fold increase in lifetime risk of cancer in those living within 500 ft – the current setback distance.

118.     Residents throughout Colorado living near gas and oil developments, including those in nearby Erie, Colorado, have complained personal experiences of sudden nosebleeds, headaches, nausea, dizziness, and also sleep disturbances due to the development activities.

119.     The COGCC is aware of these complaints and health studies, but granted the Livingston Drilling Permits and others related to the Amended Residential Fracking Project without any demonstrable concern for the health, safety, and welfare of Colorado residents.

120.     The Livingston Drilling Permits and the Amended Residential Fracking Project are recognized by the COGCC as proposing an unprecedented level of modern oil and gas activity and hydraulic fracking operations in close proximity to densely populated residential communities. Accordingly, the COGCC has recognized the importance of imposing state-of-the-art provisions intended to best protect public health and safety. However, in practice, the COGCC decision approving the Drilling Permits and the Amended Residential Fracking Project fall short of ensuring that affected residents will be protected by all of the measures negotiated and agreed to between various parties to avoid, minimize or mitigate threats and risks.

121.     As the footprint of modern hydraulic fracturing operations expands across the Front Range, there have been well pad and pipeline fires and explosions; debilitating air pollution only seen through infrared cameras; well failures and "spills" causing groundwater pollution; unregulated dumping of radioactive waste; destruction of water supplies; permanently scarred landscapes; soil contamination; and other threats to public health, safety, property, and the environment.

122.     Specific incidents include, but are not limited to:

    a.   January 2017 – Well blowout near Hudson, Colorado caused 28,000 gallons of oil, gas, and drilling waste water to gush from a damaged well over a period of three days. It shut down roads, and material from the well-traveled as far as 2,000 feet away from the site of the accident.

    b.   April 17, 2017 – Home explosion in Firestone, Colorado, caused by unrefined methane migrating into the basement of the home from an abandoned well and flow line, resulting in two fatalities in the home and leaving a third victim badly burned.

    c.   May 2017 – Oil tank fire in Weld County caused death of one worker and injuries to three.

    d.   June 2017 – Oil tank in Erie leaked more than 5,000 gallons of oil into the ground.

    e.   December 2017 – A Windsor drilling site fire. This site was owned and operated by Extraction Oil & Gas, Inc.

123.     Extraction is a particularly problematic actor that has accumulated 25 Notices of Alleged Violation on its wells between 2015 and 2018, and has been penalized by the COGCC on:

a. Oct. 27, 2015 – COGCC approves a penalty of $17,080 against Extraction for fracking at least two wells without required prior notification;

b. April 18, 2016 – COGCC approves a penalty for failing to use required sound mitigation techniques resulting in at least eleven separate complaints to the Commission;

c. June 6, 2016 – COGCC approves a penalty for unauthorized flaring at three wells in September of 2015;

d. August 29, 2016 – COGCC approves a penalty of $62,000 against Extraction for violations of Rule 303 and storm water mismanagement with dates of violation from January through April of 2016;

e. September 29, 2016 – COGCC approves a penalty of $27,000 for against Extraction for drilling eleven wells less than the approved setback distance from a nearby utility line;

124.   Extraction was already under investigation by the CDPHE for air quality violations in Windsor and Greeley in October of 2017, prior to the explosion which occurred at one of their wells in Windsor in December of that year.

125.   Scientific studies, such as the following, provide insight into the negative effects of or risks associated with COGCC's current policies regarding accident reporting, and permit review:

a. Blair B. D., et al., *Is reporting "significant damage" transparent? Assessing fire and explosion risk at oil and gas operations in the United States*, 29 ENERGY RESEARCH & SOCIAL SCIENCE 36–43 (2017).

b. Allshouse W. B., et al., *Spatiotemporal industrial activity model for estimating the intensity of oil and gas operations in Colorado*, 51(17) ENVIRONMENTAL SCIENCE & TECHNOLOGY 10243–50 (Aug. 9, 2017).

126.   The Director is specifically tasked with administering the Act, which includes the preventing waste and safeguarding, protecting, and enforcing the coequal and correlative rights of owners and producers. C.R.S. §§ 34-60-102, 104.5, 117.

127.   The Director is further tasked with ensuring that proposed wells will be economic and efficient. C.R.S. §§ 34-60-104.5, 116(2).

128.   COGCC, through the Director, routinely requires no evidence that applications will protect against waste and protect correlative rights. In fact, COGCC (acting by and through the Director, the Hearing Officer, and/or the commissioners) failed to require specific information in this case despite Wildgrass OGC's repeated requests for specific information.

129.   COGCC, through the Director, routinely requires no evidence that proposed wells will be efficient or economic. In fact, COGCC did not require Extraction to provide sufficient specific information on these issues in the case despite Wildgrass Owners' repeated requests at multiple stages of the process.

130.    Despite both Broomfield and the Wildgrass Owners repeated requests, COGGC, through the Director, granted the Livingston Drilling Permits without adequate evidence that the Amended Residential Fracking Project would protect against waste and protect correlative rights.

131.    Despite both Broomfield and the Wildgrass Owners repeated requests, COGGC, through the Director, granted the Livingston Drilling Permits in the absence of adequate evidence that the Amended Residential Fracking Project would be economic or efficient.

132.    COGCC repeatedly denied requests by Broomfield and the Wildgrass Owners to obtain relevant discovery to efficiency, economy, waste, and correlative rights.

133.    COGCC ignored the fact that granting the Livingston Drilling Permits based on the existing record exposed the mineral rights of Wildgrass Owners being taken without due process of law and just compensation.

134.    The financial viability of oil and gas companies, including the ability to inspect and maintain physical assets on a long-term basis is extremely uncertain and varies according to global prices for oil and gas. Nearly 100 oil and gas companies invested in the 'shale boom' went bankrupt in 2015 and 2016. There are large, demonstrable financial, operational, and public health and safety hazards of proceeding with oil and gas development without assurance of profitability and efficiency. Here are just some examples:

   a.   Hunn, David, *Woe in the Oilfield: 213 Companies have now Declared Bankruptcy*, HOUSTON CHRONICLE: FUELFIX (10/25/2016);

   b.   *Median Breakeven Price for Oil is $55 per Barrel; Gas is $3.50 per Mcfe-KLR*, OIL & GAS 360 (5/23/2016) (*available at* https://www.oilandgas360.com/median-breakeven-price-oil-55-per-barrel-gas-3-50-per-mcfe-klr/);

   c.   DiPierro, Amy, *Energy Company that beat SEC's Ponzi lawsuit files for Chapter 7 bankruptcy*, BUSINESSDEN (4/28/2016);

   d.   *US shale investors still waiting on payoff from oil boom*, REUTERS (Feb. 23, 2017);

   e.   Scheyder, Ernest, *High risk of bankruptcy for one-third of all oil firms: Deloitte*, REUTERS (Feb. 16, 2016).

135.    At the December 12, 2017, Department of Natural Resources Fiscal Year 2018–19 Joint Budget Committee Hearing, COGCC reported:

   a.   244 orphan wells were identified in Colorado, and estimated that another 300 will be Orphaned in the next five years.

   b.   There are likely hundreds more orphan wells that not been reported to COGCC.

    c.   COGCC lacks adequate staffing and resources to properly abandon all the orphan wells in Colorado that have been improperly left by operators that could not afford to properly plug and abandon oil and gas wells.

    d.   Orphan wells are more likely to leak pollutants, contaminate groundwater, and trigger explosions.

    e.   COGCC has only plugged and reclaimed 52 orphaned wells since 2013, at an average cost of $82,500 each.

    f.   Dealing with orphan wells will cost an estimated $5.3 million annually over the next five years.

136.    There are currently at least 63 Operators in Colorado that COGCC considers distressed, meaning the Operator has either missed required safety tests or is not producing much product. These distressed Operators collectively control almost 4,000 wells in Colorado.

137.    Despite all of this information, COGCC failed to require adequate bonds to protect the state and public health and safety from the risks of future abandonment of the Livingston wells, which heightened safety risks due to their location in the midst of residential communities.

### First Claim for Relief
*Violation of the Privileges and Immunities Clause -*
*Article XIV, Section 2, of the United States Constitution*

138.    Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

139.    The Act constitutes a special law in violation of the privileges and immunities clause of the United States Constitution because it grants exclusive privileges to private gas and oil operators and injures Wildgrass Owners.

140.    The Act impermissibly creates classes which are not reasonable or rationally related to a legitimate public purpose.

141.    The Act conflicts with applicable general laws including but not limited to:

    a.   Due process requirements;

    b.   The prohibition against trespass; and

    c.   The Fourteenth Amendment of the United States Constitution.

### Second Claim For Relief
*Violation of Procedural and Substantive Due Process*
*Amendment V and Amendment XIV, Section 1 to the United States Constitution*

142.    Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

143.    The Act denies Wildgrass Owners' right to substantive and procedural due process implicit in the United States Constitutions.

144.    The Act deprives Wildgrass Owners of property rights implicit in the concept of ordered liberty, and regulates Wildgrass Owners private property in ways not rationally related to the Act's stated purpose.

145.    The Act allows the COGCC to deprive a party of property without engaging in fair procedures to reach a decision, and actually requires the COGCC to deprive mineral owners of property for an arbitrary reason.

146.    The Act impermissibly requires private property to be taken for another's private use.

147.    The Act will deprive Wildgrass Owners of the economically viable use of their property, without due process, without just compensation, and for private use.

148.    Wildgrass Owners have sought relief through the state and further attempts will be futile.

149.    The forced taking of the Wildgrass Owners' property is unrelated to any constitutionally permissible governmental interest and, therefore, violative of the proscriptions against taking private property without just compensation.

### Third Claim For Relief
*Violation of Freedom of Speech and Association*
*Amendment I to the United States Constitution*
*(Applied to States under Amendment IVX)*

150.    Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

151.    The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment against the States: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

152.    The Act violates the free speech rights of mineral owners by compelling them to subsidize private speech on matters of substantial public concern.

153.    The First Amendment forbids coercing any money from Wildgrass Owners to subsidize the oil and gas operations of a private corporation, especially where the Wildgrass Owners, and the public at large, have strongly objected to the positions the company and the COGCC have taken with respect to residential fracking, and the companies' related activities.

154.    As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical."

155.     The government may not prescribe matters of opinion or force citizens to confess by word or act their faith therein, and compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command.

156.     The Act does not promote a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.

**Fourth Claim For Relief**
*Violation of Contract Clause*
*Article I, Section 10 of the United States Constitution*

157.     Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

158.     The Act violates the United States Constitution's prohibition against a state passing any law that "impairs the obligation of contracts."

159.     Wildgrass Owners have a right to their property;

160.     The Act substantially impairs non-consenting owners' ability to negotiate the value, rights, and duties of a contract with a private oil and gas company.

161.     The Act also penalizes non-consenting owners by forcing them to accept unfavorable terms for their property.

162.     Forcing non-consenting owners to accept the Act's statutory penalties impairs the value of any meaningful ability to negotiate a contract.

163.     The Act strips remedies of any person who is deemed a non-consenting owner by a private oil and gas company.

164.     There is no legitimate public purpose for stripping non-consenting owners' right to negotiate a contract, penalizing non-consenting owners for refusing to hand over their property, and denying remedies to non-consenting owners.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court order the following relief:

1.     A declaratory judgment declaring the Act unconstitutional and declaring non-consenting owners' rights;

2.     Injunctive relief preventing the Act and related COGCC Rules from being enforced;

3.     Attorney's fees and costs incurred in prosecuting this action to Plaintiff; and

4.     Issue such other relief as the Court deems just and equitable.

Dated:  January 22, 2019                    Respectfully submitted,


                                      By:   */s/Joseph A. Salazar*
                                            COLORADO RISING FOR COMMUNITIES
                                            Joseph A. Salazar, #35196
                                            PO Box 370
                                            Eastlake, CO 80614-0370
                                            (303) 895-7044 – Office
                                            joe@corising.org

                                            MINDDRIVE LEGAL SERVICES, LLC
                                            James D. Leftwich, #38510
                                            1295 Wildwood Rd.
                                            Boulder, CO 80305-5641
                                            (720) 470-7831 – Office
                                            dan@minddrivelegal.com

                                            **ATTORNEYS FOR PLAINTIFF**