IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

WILDGRASS OIL AND GAS COMMITTEE,

       Plaintiff

v.

STATE OF COLORADO; JARED S. POLIS, in his official capacity as Governor of the State of Colorado; COLORADO OIL AND GAS CONSERVATION COMMISSION; and JEFFREY ROBBINS, in his official capacity as Director of the Colorado Oil and Gas Conservation Commission,

       Defendants

AMERICAN PETROLEUM INSTITUTE and COLORADO OIL AND GAS ASSOCIATION,

       Intervenors.

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff WILDGRASS OIL AND GAS COMMITTEE brings this action against defendants STATE OF COLORADO (the "State"); JARED S. POLIS, in his official capacity as Governor of the State of Colorado (the "Governor"); COLORADO OIL AND GAS CONSERVATION COMMISSION ("COGCC"); and JEFFREY ROBBINS (the "Director"), in his official capacity as Director of the Colorado Oil and Gas Conservation Commission; and in support of its claims states as follows:

## NATURE OF THE ACTION

1.  This case challenges the Constitutionality of C.R.S. §34-60-116 (the "Act"), facially and as applied, which allows the COGCC to provide private companies access to Colorado residents' minerals without the owner's consent, and even when the mineral owner objects.

2.   After sustained participation in COGCC administrative processes and proceedings over countless hours spanning almost two years, Plaintiff's members who own minerals ("Wildgrass Owners") received an election letter requiring that they either elect to voluntarily participate in the large-scale residential fracking project planned by Extraction Oil and Gas for their neighborhoods or have their minerals pooled into the project and suffer a hefty penalty despite their myriad objections to the residential fracking project.

3.   In reliance on the Act, and the rules promulgated by the COGCC (the "COGCC Rules"), the COGCC and the Director consistently "rubber-stamp" requests by private corporations for orders granting them access to the minerals of non-consenting mineral owners and penalizing non-consenting owners in violation of the United States Constitution.

4.   The Act, on its face, and as applied by Defendants:

   a.   Allows the COGCC to not only access the non-consenting owners' minerals, but does so for the benefit of a private corporation, and without protection of the mineral owners' substantive and procedural due process rights.

   b.   Interferes with Wildgrass Owners' right to protect their property, and allows for unlawful trespass.

   c.   Interferes with Plaintiff members' constitutional right to freedom of association.

   d.   Impairs the constitutional right to contract.

5.   The continued implementation and enforcement of the Act constitutes an imminent and ongoing threat by the State of Colorado, acting by and through Defendant Jeffrey Robbins as Director of the COGCC.

6.   The Wildgrass Owners are entitled to declaratory and injunctive relief holding that the Act is unconstitutional and enjoining Defendants from enforcing the Act.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because the matter in controversy arises under the laws and Constitution of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and 42 U.S.C.§ 1983. Plaintiff seeks injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.     This action is brought pursuant to the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983 for declaratory and injunctive relief, for the purpose of protecting the due process and associational rights of members.

9.     Venue rests properly in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) both because all Defendants reside in the State of Colorado and because all events giving rise to the claims herein occurred in Colorado.

10.     The Eleventh Amendment to the United States Constitution does not deprive this Court of jurisdiction because only injunctive and declaratory relief is sought.

## PARTIES

A.  Plaintiff

11.     The Wildgrass Oil and Gas Committee ("Wildgrass OGC") members include mineral owners in the Wildgrass subdivision in Broomfield, Colorado which is one of the neighborhoods affected by the pending oil and gas operations described herein. As such, the Wildgrass Owners filed protests in accordance with the COGCC rules and regulations. The Wildgrass OGC is an independent organization which assists its members as they attempt to ensure that gas and oil development in their community is done responsibly consistent with applicable rules, regulations, laws, court decisions, and citizen's rights under the State and Federal constitutions.

**B.  Defendants**

12.     Defendant COGCC is the state agency responsible for administering the Act and for the protection of the health, safety and welfare of the people of Colorado from the health and safety risks of oil and gas operations, including risks to the environment and wildlife resources, in the Commission's implementation and enforcement of the Act.

13.     Defendant Jared S. Polis is the Governor of the State of Colorado, and is required by the Colorado Constitution to ensure that all laws of the state are faithfully executed.  COLO. CONST. ART. IV § 2. As Colorado's Chief Executive, the Governor is the proper defendant to actions to enjoin or invalidate the application of the Act. *Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008).

14.     Defendant Jeffrey Robbins is the Director of the COGCC, and in that official capacity, he is responsible for the implementation and enforcement of the Act, which is accomplished largely through the COGCC Rules. As described herein, Defendant Robbins is responsible for the administration, regulation, and enforcement of the Colorado Oil and Gas Conservation Act. Defendant Robbins is sued in his official capacity.

15.     The State of Colorado, operating through legislative action, adopted and revised the Drilling Units-Pooling Interests section of the Act. C.R.S. §34-60-116. The statutory mandates in the Act are forbidden by the U.S. Constitution.

## PROCEDURAL POSTURE, BACKGROUND, AND FACTUAL ALLEGATIONS

**A.      The Rule of Capture**

16.     Under the Rule of Capture, a lessee under an oil and gas lease acquires title to the oil and gas that it produces from wells drilled on property it has rights to access, even though part

of the minerals have migrated from beneath adjoining or nearby properties where it does not have such rights.

17.     The premise is based upon the fact that transient oil and gas have the power and the tendency to escape across property lines without any action or consent by the owner, and the Rule of Capture treated such transient minerals as one's property only when captured.

18.     Hydraulic fracturing, however, especially when horizontal drilling is employed, is distinguishable from the conventional methods of oil and gas extraction that gave rise to the Rule of Capture.

19.     Hydraulic fracturing is a well stimulation technique in which non-transient rock is fractured by a pressurized liquid. The process involves the high-pressure injection of 'fracking fluid' (primarily water, containing sand or other proppants suspended with the aid of thickening agents) into a wellbore to create cracks in the deep-rock formations through which natural gas, petroleum, and brine will flow. When the hydraulic pressure is removed from the well, small grains of hydraulic fracturing proppants (usually either sand or aluminum oxide) hold the fractures open.

20.     The Rule of Capture assumes that oil and gas originate in subsurface reservoirs or pools, and can migrate freely within the reservoir and across property lines, according to changes in pressure. Modern day horizontal hydraulic fracturing, however, differs dramatically from conventional gas drilling, in that it accesses oil and natural gas that is trapped in the rock formations, *i.e.,* is non-migratory in nature and specific tracts must be specifically targeted for extraction.

21.     Put another way, the product does not merely escape to adjoining land absent the application of an external force. Instead, the shale must be fractured through the process of

hydraulic fracturing; only then does the oil and natural gas contained in the rock formations move through the artificially created channels.

22.    Another distinction from conventional drilling is that current technologies allow an operator to drill at least two miles horizontally in any direction from the well pad, which allows the operator to purposely target the minerals of others, including those that do not consent to having their minerals extracted.

23.    The Rule of Capture has not been modified in the State of Colorado to include the hydraulic fracturing of non-transitory minerals, such as those minerals targeted by hydraulic fracturing.

**B.    The Act**

24.    The Colorado General Assembly has adopted legislation that modifies the rule of capture in the Act via sections C.R.S. §34–60–101 *et seq*. to create "spacing" rules that limit the number of wells that can be drilled in a specific tract of land.

25.    These spacing rules were deemed necessary only because courts had stated that the remedy for property owners who objected to others "capturing" the oil and gas pooled beneath their land was to drill their own well and "capture" the oil and gas themselves. This byproduct of the Rule of Capture led to massive over drilling of wells.

26.    Along with the spacing rules, the Act and COGCC Rule 503, the legislature and COGCC have codified a process called "pooling."

27.    Pooling occurs when various parcels or interests are combined for purposes of mineral extraction so that costs and revenues are apportioned among the interest holders. C.R.S. § 34–60–116(6). Pooling orders were necessitated by the imposition of spacing rules, which limited the number of wells that could be drilled, as a result of the Rule of Capture. As described herein,

the Rule of Capture no longer justifies these spacing and pooling rules when applied to hydraulic fracturing, and the dangers of over drilling of wells is no longer present.

28.     Pooling may be voluntary or involuntary under the Act and COGCC Rules.

29.     Involuntary, or forced, pooling was deemed useful to avoid "holdouts" who did not want to participate in pooling arrangements, but the oil and gas under their land was going to be drained against their will anyway as a result of the Rule of Capture. As described herein, forced pooling is the equivalent of eminent domain for private corporations, and without fair market compensation.

30.     With the advent of horizontal hydraulic fracturing, forced pooling is no longer justified, but is often used as a hammer to require reluctant mineral owners to lease their minerals.

31.     Once rare, forced pooling is now much more common as a means of increasing oil and gas operators' profitability because of the large 640-acre to 1,280-acre spacing and drilling units that are being developed through horizontal hydraulic fracturing.

32.     The law in Colorado allows forced pooling if operators own or have leased *any* acreage within the relevant drilling unit. Thus, operators can force pool multiple neighborhoods and thousands of people even if they directly have access to only one landowner with mineral interests, no matter the size.

33.     While the COGCC does not require operators to report the number of people that they force pool, and does not itself publish this information, Plaintiff estimates that at least 30,000 mineral owners were force pooled in 2018 alone.

34.     The process to allow for forced pooling in Colorado requires only that the unleased mineral owner be given a "reasonable" offer to lease their minerals, which is a vague and undefined term.

35.     The Act gives the COGCC sole discretion to determine whether an offered lease is "reasonable," the only guideline being that the terms should be "no less favorable than those currently prevailing in the area."

36.     COGCC Rule 530b(2) indicates that COGCC will consider the following factors to determine whether a lease is reasonable: (1) Date of lease and primary term or offer with acreage in lease; (2) Annual rental per acre; (3) Bonus payment or evidence of its non-availability; (4) Mineral interest royalty; and (5) Such other lease terms as may be relevant.

37.     In reality, however, the COGCC routinely grants forced pooling applications so long as the operator can show that it was able to convince any mineral owners in the space to sign the lease at issue. Given the real threat of force pooling, this is not a fair test of the reasonableness of a lease.

38.     A mineral owner is considered non-consenting, and therefore will be forced pooled, if they do not lease (or become an active or passive working interest owner) after receiving notice at least 60 days before the COGCC hearing on the operators' pooling application.

39.     The only recourse the non-consenting mineral owners have is to hire an attorney and protest the pooling application to the COGCC. This abuse of the state process is allowing operators to strong arm mineral owners into signing poor leases under duress.

40.     The private corporations that are benefitting from force pooling are provided with the means to conduct a government taking, but without due process and without just compensation.

41.    In fact, the Act not only allows private companies to access the mineral owner's property, it severely penalizes any non-consenting mineral owners by:

   a.   Allowing the private gas and oil operators to recover from the non-consenting owner's share of production:

      i.   <u>One hundred percent</u> of the non-consenting owner's share of the cost of surface equipment beyond the wellhead connections, including stock tanks, separators, treaters, pumping equipment, and piping, <u>plus one hundred percent</u> of the non-consenting owner's share of the cost of operation of the well or wells commencing with first production and continuing until the consenting owners have recovered such costs; and

      ii.   <u>Two hundred percent</u> of that portion of the costs and expenses of staking, well site preparation, obtaining rights-of-way, rigging up, drilling, reworking, deepening or plugging back, testing, and completing the well, after deducting any cash contributions received by the consenting owners, <u>and two hundred percent</u> of that portion of the cost of equipment in the well, including the wellhead connections.

   b.   Fixing the non-consenting owners' proportionate royalty at twelve and one-half percent until such time as the consenting owners recover, only out of the non-consenting owner's proportionate seven-eighths share of production, the costs specified above.

42.    After recovery of the costs specified above (the "Penalties"), the non-consenting owner then is deemed to be a "working interest owner" whereby, despite any objections to the

project, they own their proportionate share of the wells, surface facilities, and production and are liable for further costs as if the owner had originally agreed to drilling of the wells.

43.    Put simply, the Act supports operators in forcing mineral owners to either accept offered lease terms or have their minerals taken with deep penalties and, worse, be considered a working interest owner in the project regardless of their health, safety, environmental, or economic concerns.

**C.    Actions Before Federal District Court**

44.    On February 8, and 12, 2019, Plaintiff presented oral arguments and testimony to the Court from Wildgrass members who are mineral rights owners. Wildgrass members demonstrated that they were mineral rights owners, living in the affected unit, and had received notices that they would be force pooled if they did not take an offer made by an oil operator, Extraction Oil and Gas, Inc. ("Extraction").

45.    State Defendants did not contest Wildgrass members' standing or that these mineral owners were being affected.

46.    The Wildgrass members also testified that they were not informed by Defendant COGCC or Extraction about whether or how the project would effect health, safety, or welfare, whether Extraction was financially capable of completing the project, whether they were receiving just and equitable shares, and they felt they had no bargaining power because of the coercive nature of Colorado's forced pooling statute. Wildgrass members also expressed objection to being forced into an association with an industry that would use proceeds gained from fracking their minerals for political speech.

47.    Wildgrass' claims addressed how the COGCC administrative process stripped them of the ability to discover information related to their concern during the COGCC permitting

process. Wildgrass brought to the Court's attention that Extraction was prepared to start spudding wells at one of the pad sites in the residential fracking project in Broomfield in March 2019 and drilling those wells in June 2019 without having received all permits or leasing from mineral owners.

48.    As part of their initial complaint, Wildgrass raised allegations that the Defendant COGCC violated their rights under the United States Constitution involving substantive and procedural due process; violated the privileges and immunities clause; violated freedom of speech and freedom of association; and violated the contract clause.

49.    After testimony, the Court ordered that: 1) no drilling occur until June 2019; 2) Defendant COGCC was ordered to hold the pooling hearing on March 11, or 12, 2019; 3) that "there better be clear evidence that [Defendant COGCC] considered environmental, safety, and other issues" such as economy and just and equitable shares.

## D.    Pre-Hearing Due Process Violations

50.    After the February 12, 2019 order, Wildgrass began preparations for the COGCC hearing. In line with the Court's order, Wildgrass raised the following issues as memorialized in the Case Management Order:

- Extraction's Application to pool all interests in an approximate 1,600-acre proposed drilling and spacing unit ["PDSU"] for the S½ of Section 7 and all of Sections 18 and 19, Township 1 South, Range 68 West, 6th P.M., failed to comply with notice requirements to the affected mineral owners ["Owners"].

- Extraction failed to make reasonable lease offers to the Owners in the affected PDSU, instead making a generic lease offer which greatly benefitted Extraction at the expense of the Owners. Extraction has taken the stated position that Owners are not entitled to

a lease negotiation, only a "take it or leave it" offer.

- Extraction failed to make financial disclosures regarding the profitability of the proposed project, whether the project is financially viable at this time, whether development at this time is an efficient use of the resource.

- The health and safety of the proposed project has not been comprehensively evaluated using any scientific or quantitative means, including whether Extraction is using all cost-effective and feasible means of preventing and mitigating significant adverse environmental impacts to the extent necessary to protect public health, safety, and welfare.

- The COGCC has not required Extraction to post bonds to the extent necessary to ensure that adequate funds will be available for plugging and abandonment including reclamation.

- Colorado's forced pooling statute is currently under constitutional review in Federal Court. The Commission should stay all proceedings under C.R.S. § 34-60-116 and Rule 530 until such constitutional questions are resolved.

51.    Although Wildgrass was allowed to engage in discovery based on the parameters of the Court's February 12, 2019 Order, Defendant COGCC denied Wildgrass the ability to discover internal documents involving Extraction's financial condition; and information involving leases, including accepted and rejected offers, made by Extraction to other mineral owners in a 25 square mile radius of the Drilling Unit.

52.    With respect to the leases, Wildgrass advised the COGCC hearing officer about the Court's reliance on Judge Winmill's decision in *Citizens Allied for Integrity and Accountability, Inc. v. Schultz*, No. 17-cv-00264, 2019 WL 418406, at *2 (D. Idaho Feb. 1, 2019), and that

Wildgrass should be allowed to discover leases within a 25 mile radius. The hearing officer, in direct contravention to the Court's Order, denied Wildgrass the ability to discover the information.

53.     In addition, Wildgrass indicated that it intended to submit exhibits evidencing Extraction's history of accidents, including a major explosion in Windsor, Colorado, and major toxic gas release in Erie, Colorado, to address the Court's Order on health, safety, and welfare issues.

54.     The COGCC hearing officer denied Wildgrass the ability to present these documents.

55.     In the hearing officer's Final Prehearing Order, he noted Wildgrass' objection to Defendant COGCC's jurisdiction regarding pooling of non-migratory minerals.

56.     In fact, on March 5, 2019, Wildgrass submitted a Proposed Order Re: COGCC Jurisdiction finding that because the Colorado Oil and Gas Conservation Act, grounded in the Rule of Capture, does not apply to non-transient mineral, such as shale, the COGCC does not have jurisdiction over the pooling matter.

57.     The Proposed Order provided the same case law and arguments previously presented to the Court.

58.     Despite the fact that this hearing could have taken a number of days, based on witnesses and thousands of documents submitted by Extraction and over a thousand documents submitted by Wildgrass, and despite the fact that Wildgrass requested a minimum of three (3) hours to present its case, the hearing officer denied Wildgrass' request and limited the hearing to one hour and fifteen minutes for each side to present: 1) its case-in-chief with direct and cross examinations counting against the time of the parties; 2) an additional "rebuttal" portion of the hearing, which also included additional direct and cross examination counting against the time of

the parties; and 3) closing statements.

59.     Wildgrass objected to Extractions' witnesses based on repetitive and cumulative testimony, which was denied. Extraction was allowed nine (9) witnesses. Due to the severely limited amount of time, Wildgrass proposed three (3) witnesses.

**E.      March 12, 2019 COGCC Hearing**

60.      At the beginning of the hearing in front of the COGCC Commissioners, Wildgrass again raised its objection to jurisdiction. Specifically, Wildgrass objected that the COGCC did not have jurisdiction to hear the pooling application as hydraulic fracturing of non-transient minerals does not apply to the Rule of Capture upon which the Colorado Oil and Gas Conservation Act is premised.

61.     Wildgrass also objected that it was not provided enough time to present its case, thereby, failing to provide it a full and fair opportunity to present its case involving thousands of documents and numerous witnesses.

62.     Also, Wildgrass objected to the fact that Extraction had not met its procedural burden to show that it had contacted some of the mineral owners, according to statute.

63.     Wildgrass objected to the denial of discovery of Extraction's economic/financial condition.

64.     Despite raising these objections at the beginning of the hearing, particularly on the issue of jurisdiction, the COGCC Commissioners failed or refused to issue any rulings on these objections.

65.     Throughout the hearing Mimi Larson, COGCC Hearings Manager, was charged with tracking the time of each party, to the very minute and second, to ensure that no party went over its allotted one hour fifteen minute time.

66.     Extraction had the burden of proof during the pooling hearing.

**I.      Leases**

67.     During the hearing, Extraction admitted that it did not have 13 percent of the leases in the Drilling Unit.

68.     While Extraction argued that it attempted to contact the remaining mineral owners, it did not provide any documented evidence of contact such as certified mailings, which it said it had.

69.     In discovery, Wildgrass sought discovery of documents demonstrating Extraction's communications with mineral owners, including lease offers, in a 25 mile radius as per Judge Winmill's ruling in *Citizens Allied*.

70.     The hearing officer denied Wildgrass discovery in part and ordered Extraction to turn over communications with mineral owners in the Drilling Unit, only.

71.     No such documented communications to mineral owners was produced by Extraction to Wildgrass or produced during the hearing.

**a.  Questions about Fair and Reasonable Leases**

72.     Wildgrass noted to the COGCC Commissioners during its opening statement that Extraction would produce a self-created Excel spreadsheet of alleged lease offers apparently showing that the lease offers in the area were fair and reasonable. In particular, Wildgrass noted that this document did not demonstrate a rhyme or reason for the "madness" of the lease offers.

73.      According to an Extraction witness, Extraction petroleum engineers, not financial experts, came up with what they thought would be fair and reasonable offers made to Wildgrass and other residents.

74.     COGCC Commissioner expressed skepticism about the Extraction exhibit. In

asking questions of the Extraction witness, Commissioner Boigon highlighted how Extraction's offers were inconsistent and said, "I'm not sure that the exhibit supports the statement you made."

75.     COGCC Commissioner Jolly noted that the document was "pretty incomplete without knowing what the royalty is…"

76.     At the end of the witness examination, Wildgrass again noted that it requested the leases, but did not receive the leases from Extraction.

77.     The only response from COGCC Commissioner Benton, chair of the Commission, was, "So noted."

78.     In a closing statement, Commissioner Overturf made the following observation:

> *Extraction bears the burden of proof to provide us that evidence. And when asked, they pointed to Exhibit 3 and Exhibit 1 as the basis for – as their evidentiary support for those criteria that are set forth in statute.*
> *And while those exhibits lay out lease offers that were provided by Extraction, there's no contextualization of those offers within what's available in the area at the time, and I think without that type of information, it is impossible, nearly impossible, for the commission to assess whether the terms were offered are just and reasonable.*

79.     In other words, Extraction's presentation was based on the tautology that Wildgrass mineral owners were offered leases, ergo, they were offered fair and reasonable leases.

80.     In addition, it remained undisputed that neither Extraction nor Defendant COGCC provided any mineral owners with estimates about what just and equitable compensation they should expect from the project.

## II.     Health, Safety and Welfare

81.     At the beginning of the hearing, Wildgrass noted that the day before the hearing (March 11, 2019), the COGCC Commissioners had just fined Extraction $805,000 for failing to conduct required safety tests on many of their wells.

82.     Throughout the hearing, Wildgrass presented studies and other health documents received from Extraction involving the health and environmental effects caused by the oil and gas industry.

83.     Because of the limited amount of time, Wildgrass was unable to go through each study in a thorough manner or to question Extraction's "expert" witnesses based on these documents found in Extraction's files.

84.     One COGCC Commissioner noted that there were safety concerns from Extraction in Weld County.

85.     Again, Wildgrass was not allowed to present information related to the Windsor explosion or the massive gas release in Erie investigated by Defendant COGCC.

86.     Just before the hearing closed, Wildgrass provided COGCC Commissioners a list of numerous safety violations by Extraction.

87.     Defendant COGCC and the COGCC Commissioners were aware that the Court expected that they seriously consider by "clear evidence" Wildgrass' concerns about environment and safety.

88.     That being said, while COGCC Commissioners agreed to take "administrative notice" of Extraction's numerous safety violations, there was no further discussion about these violations or the effects on public health, safety, and welfare or on the environment.

89.     In fact, the lack of seriousness of health, safety, and welfare was evident in the Commissioners' comments at the closing of the hearing.

90.     While the Commission discussed how Extraction and the City and County of Broomfield engaged in a process to address health and safety concerns. Commissioner Boigon lamented that the Court forced the COGCC to address health, safety, and welfare in the pooling

hearing. As stated by Commissioner Boigon:

> *And I agree with Commissioner Overturf's characterization of this proceeding. I think if this proceeding had been limited to the issues that I believe the statute and the rule contemplate should be addressed in this proceeding, that is whether the offers tendered were reasonable and complied with the statute and the rule, we could have had a much more focused discussion.*
>
> *Instead, there were all over the place because a lot of extraneous issues were brought into this proceeding, including, in my view, the whole question of protection of public, health, safety, and welfare which we addressed because the federal court asked us to.*

91.    Commissioner Boigon apparently forgot, which the Court was careful to remind Defendant COGCC, that the statute requires that the protection of health, safety, and welfare is to be a factor in considering applications for permits.

**III.    Further Evidence of a Sham Hearing**

92.    Throughout the hearing, Wildgrass was denied the opportunity:

- to discover or present information related to public health, safety, and welfare and environment;

- to discover information about economics or the financial viability of Extraction;

- to receive and present information about the lack of fair and reasonable offers; and

- to receive a ruling on the jurisdiction question related to force pooling

93.    In addition to these due process failures, at the close of hearing, and when witnesses had already left the hearing, Commissioner Benton asked Wildgrass if it had additional time "what would you bring forward."

94.    Wildgrass attorneys expressed that giving a few more minutes, at the end of the hearing when people have left, would not cure any defects.

IV.      **Closing Statements from COGCC Commissioners**

**Forced Pooling Jurisdiction Question –**

95.      Wildgrass raised the issue of jurisdiction at the beginning of the March 12, 2019

hearing.

96.      Wildgrass also provided the Defendant COGCC a proposed order involving

jurisdiction, which included case law.

97.      With this objection and pleading in front of Defendant COGCC, Commissioner

Boigon made the following statements about the forced pooling statute:

> *The process doesn't work so well in this kind of a setting with a*
> *subdivision of hundreds and hundreds of homeowners. Pooling*
> *was not originally intended to apply in that context. It's only*
> *because of horizontal drilling that this has become an issue.*
> *And the rules, the statute, they weren't really written with this*
> *kind of situation in mind...*
> *And I have seen in my own practice evidence that the pooling*
> *process can be abused....*
> *I don't subscribe to the theory that whatever an operator wants*
> *to put in front of another working interest or mineral owners has*
> *to be accepted because that is what the operator is offering...*
> *And so I'm sorry for going on on this, but it's important that*
> *people, at least, understand my thinking on this whole pooling*
> *process which I agree is not – the statute and the rule were*
> *written for a different time and different type of context and*
> *they're being applied now in ways that don't always fit really*
> *well...*

98.      Commissioner Overturf also opined about the jurisdictional question of forced

pooling:

> *I heard the number of references to – that the pooling statute is*
> *in some ways the product of a different age, and that it was never*
> *– at the time it was drafted, it couldn't have been foreseen the*
> *circumstances in which it's being applied today.*
> *And I have long shared that view.*

99.      Even with a jurisdictional objection pending, neither Defendant COGCC nor its

commissioners ruled on the jurisdictional issue.

**Vague and Ambiguous Statutory Language Interpreting Fair and Reasonable Leases –**

100.    Commissioner Overturf stated that she believed that the way the statute was structured, "…there is a fundamental inequity in the bargaining power between the operator and the mineral owner who is being faced with or presented with a forced pooling order."

101.    She also admitted that with respect to "fair and reasonable" lease offers, she believed that there is a lack of clarity.

102.    Commissioner Boigon stated the following: "The statute and the rule are not at all clear. There has to be an offer to lease on reasonable terms. How do you define "reasonable" and whose burden is it to produce evidence of reasonableness? Does Extraction have to support its offer to each mineral owner by providing evidence of leases and bonuses paid all around the area, or is it up to the owner to satisfy itself what the going rate is or at least to raise an objection or a concern and see if extraction will then provide additional detail? The statute and the rule are not at all clear…"

103.    Commissioner Ager further stated about the statute: "And I agree with – I think everyone has said it here so far, that it probably doesn't apply to a lot of ways we operate in this basin – or in Colorado anymore. It's hard to apply it and it doesn't always make sense."

**COGCC Commission Vote**

104.    With no ruling on jurisdiction, and despite comments from the commissioners expressing concern about the vagueness of the statute, whether the statute applied in this context, and concerns about Extraction's evidence, Defendant Commission voted 4-1 to approve Extraction's pooling permit.

<u>**First Claim for Relief**</u>
*Violation of Procedural and Substantive Due Process*

*Amendment V and Amendment XIV, Section 1 to the United States Constitution*

105.   Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

106.   The Act denies Wildgrass Owners' rights to substantive and procedural due process implicit in the United States Constitutions.

107.   As an example of substantive due process, even COGCC Commissioners agreed that the statute lacks clarity, the statute and rules were written for a different time, the statute is hard to apply and doesn't always make sense.

108.   Despite having an outstanding objection to jurisdiction, Defendant COGCC violated Wildgrass Owners procedural due process protections by failing/refusing to decide whether it had jurisdiction on the matter and still proceeded to vote on the forced pooling application.

109.   Because the Rule of Capture, upon which the Act is premised, does not apply to the forced pooling of non-transitory minerals via hydraulic fracturing, Defendants violated Wildgrass' due process rights by voting to approve Extraction's pooling application.

110.   The Act deprives Wildgrass Owners of property rights implicit in the concept of ordered liberty, and regulates Wildgrass Owners' private property without an adequate state interest.

111.   The Act allows the COGCC to deprive a party of property without engaging in fair procedures to reach a decision, and actually requires the COGCC to deprive mineral owners of property for arbitrary reasons.

112.   The Act impermissibly requires private property to be taken for another's private use.

113.    The Act deprives Wildgrass Owners of the economically viable use of their property, without due process, without just compensation, and for private use.

114.    Wildgrass Owners, by participating in the COGCC hearing process, have sought relief through the state and further attempts would be futile.

115.    The forced taking of the Wildgrass Owners' property is unrelated to any constitutionally permissible governmental interest and, therefore, violative of the proscriptions against taking private property without just compensation.

### Second Claim For Relief
*Violation of Freedom of Speech and Association*
*Amendment I to the United States Constitution*
*(Applied to States under Amendment XIV)*

116.    Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

117.    The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment against the States: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

118.    The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. These same constitutional provisions protect the freedom of an individual to associate for the purpose of advancing beliefs and ideas. *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2464 (2018).

119.    "Freedom of Association is an indispensable means of preserving free speech." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (citations omitted). "The right to eschew association for expressive purposes is likewise protected." *Janus*, 138 S. Ct. at 246, citing *Roberts*,

468 U.S. at 623 ("Freedom of association… plainly presupposes a freedom not to associate.").

120.    Wildgrass members, and mineral rights owners in general, have the fundamental right not to associate with an oil and gas company that is adverse to their interests.

121.    The Act also violates the free speech rights of mineral owners by compelling them to subsidize private speech by oil and gas operators on matters of substantial public concern.

122.    The First Amendment forbids coercing any money from Wildgrass Owners to subsidize the oil and gas operations of a private corporation, especially where the Wildgrass Owners, and the public at large, have strongly objected to the positions the company and the COGCC have taken with respect to residential fracking, and the companies' related activities.

123.    As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical."

124.    The government may not prescribe matters of opinion or force citizens to confess by word or act their faith therein, and compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command.

125.    The Act does not promote a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.

### Third Claim For Relief
*Violation of Contract Clause*
*Article I, Section 10 of the United States Constitution*

126.    Plaintiff incorporates by reference each allegation of the preceding paragraphs as if fully set forth herein.

127.    The Act violates the United States Constitution's prohibition against a state passing any law that "impairs the obligation of contracts."

128.    Wildgrass Owners have a right to their property.

129.    The Act substantially impairs non-consenting owners' ability to negotiate the value, rights, and duties of a contract with a private oil and gas company.

130.    At least one COGCC Commissioner agreed that the way the Act is structured there "is a fundamental inequity in the bargaining power between the operatory and the mineral owner".

131.    The Act penalizes non-consenting owners by forcing them to accept unfavorable terms for their property.

132.    Forcing non-consenting owners to accept the Act's statutory penalties impairs the value of any meaningful ability to negotiate a contract.

133.    The Act strips remedies of any person who is deemed a non-consenting owner by a private oil and gas company.

134.    There is no legitimate public purpose for stripping non-consenting owners' right to negotiate a contract, penalizing non-consenting owners for refusing to hand over their property, and denying remedies to non-consenting owners.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court order the following relief:

1.    A declaratory judgment declaring the Act unconstitutional and declaring non-consenting owners' rights;

2.    Injunctive relief preventing the Act and related COGCC Rules from being enforced;

3.    Attorney's fees and costs incurred in prosecuting this action to Plaintiff; and

4.    Issue such other relief as the Court deems just and equitable.

Dated:  April 30, 2019                          Respectfully submitted,

                                        By:    /s/Joseph A. Salazar
                                               COLORADO RISING FOR COMMUNITIES
                                               Joseph A. Salazar, #35196
                                               PO Box 370

Eastlake, CO 80614-0370
(303) 895-7044 – Office
joe@corising.org

MINDDRIVE LEGAL SERVICES, LLC
James D. Leftwich, #38510
1295 Wildwood Rd.
Boulder, CO 80305-5641
(720) 470-7831 – Office
dan@minddrivelegal.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this **30th** day of **April, 2019**, the foregoing **FIRST AMENDED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION** was sent to the following via CM/ECF:

Office of the Colorado Attorney General
Will Allen
Kyle Davenport
David Beckstrom
Eric Olson
1300 Broadway, 10th Floor
Denver, CO 80203
will.allen@coag.gov
kyle.davenport@coag.gov
eric.olson@coag.gov
david.beckstrom@coag.gov

Attorneys for State Defendants

Brownstein Hyatt Farber Schreck, LLP
Stanley L. Garnett
Mark J. Mathews
David B. Meschke
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
sgarnett@bhfs.com
mmathews@bhfs.com
dmeschke@bhfs.com

*/s/ Joseph A. Salazar*
Joseph A. Salazar