IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-00190-RBJ

WILDGRASS OIL AND GAS COMMITTEE,

     Plaintiff,

v.

STATE OF COLORADO,
JARED S. POLIS, in his official capacity as Governor of the State of Colorado
COLORADO OIL AND GAS CONSERVATION COMMISSION, and
JEFFREY ROBBINS, in his official capacity as Director of the Colorado Oil and Gas
Conservation Commission,

     Defendants

AMERICAN PETROLEUM INSTITUTE, and
COLORADO OIL AND GAS ASSOCIATION,

     Intervenors.

---

## ORDER

---

     This lawsuit arises out of plaintiff's efforts to prevent hydraulic fracturing or "fracking"

from occurring in their residential neighborhood.  Plaintiff Wildgrass Oil and Gas Committee

("Wildgrass") was formed by the Wildgrass Homeowners' Association of the Wildgrass

residential subdivision in Broomfield, Colorado to assist Wildgrass homeowners in advocating

against local fracking projects.  Plaintiff also seeks to challenge "forced pooling," the process by

which local mineral owners may be forced to allow oil and gas companies to extract their

minerals.  Defendants the Colorado Oil and Gas Conservation Commission ("COGCC"),

COGCC Director Jeffrey Robbins, and Colorado Governor Jared S. Polis ("state defendants") as

well as intervenor defendants American Petroleum Institute and Colorado Oil and Gas

Association ("intervenor defendants") move to dismiss all claims for both failure to state a claim and pursuant to the Court's discretionary authority under the *Burford* abstention doctrine. ECF Nos. 66, 67. State defendants also move to dismiss the Governor of Colorado Jared Polis based on Eleventh Amendment Immunity. ECF No. 67. In addition, intervenor defendants move to dismiss the issue as a non-justiciable political question. ECF No. 66. For the reasons set forth in this order, the case is dismissed.

## BACKGROUND

Wildgrass brings constitutional challenges to Colorado statute C.R.S. § 34-60-116, a provision of the Colorado Oil and Gas Conservation Act. Defendant COGCC is the state agency responsible for administering § 34-60-116.

### A. **§ 34-60-116**

The statutory provision creates a process through which private entities can apply to pool the interests of a group of mineral owners. This process was intended to allow for more efficient oil and gas drilling by decreasing waste and avoiding drilling of unnecessary wells. § 34-60-116. Once a drilling unit has been established, operators may extract oil and gas and the proceeds from the venture are divided among the well operator and the pooled mineral owners according to the statutory compensation scheme. *Id.*

The provision attempts to address flaws in the "rule of capture," under which the lessee of an oil and gas lease acquires title to all oil and gas produced from a drilled well, including minerals that may have migrated from adjoining lands. The rule of capture acknowledges the natural movement or migration of oil and gas across property lines without any human intervention. The rule also incentivizes increased well-drilling so that individual mineral owners

do not lose the race to extract their resources. Pooling reduces the number of wells drilled while also compensating mineral owners for their share of the resources extracted.

In Colorado, the rule of capture has been applied to both conventional drilling and fracking methods of extraction. Fracking is a drilling technique in which rock formations are fractured by pressurized liquid, releasing gas and other minerals into the well. Unlike in conventional drilling, fracking allows operators to access non-migratory minerals contained in rock formations that have not escaped into adjoining lands. Current methods allow fracking operators to drill over two miles horizontally from the central well pad, allowing access to minerals far from the site of drilling.

Operators may apply to the COGCC to establish drillings units and pool the interests of mineral owners within those units. § 34-60-116. Owners of the relevant interests may participate in pooling voluntarily, or operators may apply to the COGCC for permission to "force pool" non-consenting owners. § 34-60-116(6)(b)(I). COGCC may grant permission to force pool to "any interested person" who applies. *Id.* The operator must make a "just and reasonable" offer to the interest owners, and the COGCC must provide notice and a hearing before issuing the forced pooling order. § 34-60-116(6)(b)(II). The COGCC has authority to determine what constitutes a reasonable offer. § 34-60-116(7)(d)(II). Wildgrass claims that the COGCC "routinely grants forced pooling applications so long as the operator can show that it was able to convince any mineral owners in the space to sign the lease at issue." ECF No. 65 at 8. Once the operator is granted authority to force pool, mineral owners who do not lease their rights are considered non-consenting and subject to forced pooling. *Id.*

In addition to permitting operators to extract non-consenting owners' minerals, forced pooling also imposes other consequences: Operators may recover one hundred percent of the

non-consenting owners' share of equipment and operation expenses, as well as two hundred percent of some preparation and equipment costs. After these costs are recovered, the non-consenting owners become working interest owners. *Id*. at 9.

## B. Extraction's Application for Forced Pooling

In June of 2018 Extraction Oil & Gas, Inc. ("Extraction") sent lease offers to mineral owners in Broomfield, including Wildgrass mineral owners. Shortly after, Extraction began the COGCC applications to establish spacing units in the Broomfield areas, proposing to construct up to 120 horizontal wells from four well mega-pads in residential areas of Broomfield. ECF No. 65 at 11.

On July 17, 2018 Extraction sent an election letter to Wildgrass owners giving them 35 days to respond to either participate in these "Livingston" wells or refuse to consent. *Id*. at 2. The letter stated that the non-consenting owners would be subject to a non-consent penalty. *Id*. Extraction then sent a second election letter on August 27. The second letter asked for a response with each owner's election within 60 days. *Id*. On August 31 Extraction filed an application with the COGCC to force pool the Wildgrass owners. *Id*. at 11. The COGCC originally set the hearing on the application for October 29 and 30, 2018, but it did not occur until March 12, 2019. ECF No. 65 at 14.

On July 6, 2018 Wildgrass filed a lawsuit in Denver District Court challenging the various COGCC decisions under the Colorado Administrative Procedure Act (Case No. 2018cv32513). The Denver District Court ruled against Wildgrass, and Wildgrass has filed a pending appeal (Case No. 2019CA001212).

Wildgrass filed a complaint in this court seeking a restraining order against the COGCC on January 23, 2019. ECF No. 1. It filed an amended complaint on April 30, 2019. ECF No.

65. The complaint challenges the constitutionality of the forced pooling statute and the COGCC's approval of Extraction's forced pooling application, as well as the COGCC's refusal to consider health, safety, welfare, and environmental concerns in its decisions. *Id.*

On February 8 and 12, 2019 this Court heard oral arguments and testimony from Wildgrass and the COGCC. ECF Nos. 36, 37. At the hearing, Wildgrass voiced its concern that Extraction planned to begin drilling before the forced pooling hearing or ruling would occur. ECF No. 36. However, Extraction had revised its timeline to begin drilling in June. ECF No. 37. The Court also noted that the issues Wildgrass raised were not ripe because the forced pooling hearing had not yet occurred. *Id.* The Court directed COGCC to consider the health, safety, welfare, environmental and economic concerns raised by Wildgrass at the upcoming hearing. *Id.*

### C. <u>March 12, 2019 COGCC Forced Pooling Hearing</u>

At the COGCC hearing Wildgrass was given an hour and fifteen minutes to speak. It argued this was insufficient time to present its case on public safety, welfare, and environmental facts, which involved numerous witnesses and documents. ECF No. 65 at 14. Wildgrass also argued that the COGCC did not have jurisdiction to hear the pooling application because the rule of capture did not apply to non-migratory minerals captured through fracking. *Id.* at 13. Some commissioners expressed agreement with the sentiment that the pooling statute was "written for a different time and a different type of context." *Id.* at 19. Wildgrass finally argued that Extraction had not met its burden of contacting at least some of the mineral owners, and that Extraction should have provided discovery on its "economic stability." *Id.* at 14.

During the hearing, Extraction admitted it did not have 13 percent of the leases of the relevant mineral interests. *Id.* at 15. Although Extraction claimed it had certified mailing

receipts documenting its attempts to contact mineral owners, such receipts were never produced to Wildgrass or to the COGCC. *Id.* Extraction did produce a spreadsheet documenting lease offers made to mineral owners. *Id.* The COGCC commissioners stated that based on the evidence provided "it is impossible or nearly impossible[] for the commission to assess whether the terms were offered [sic] are just and reasonable." *Id.* at 16.

Wildgrass again raised health, safety, and environmental concerns during the hearing. In response, a commissioner stated that the hearing should have been limited to the issues of "whether the offers tendered were reasonable and complied with the statute and the [COGCC administrative] rule," and ignored "the whole question of protection of public, health, safety, and welfare which we addressed because the federal court asked us to." *Id.* at 18. The COGCC voted 4-1 to approve Extraction's forced pooling application. *Id.* at 20.

On March 26, 2019 this Court held an evidentiary hearing and granted the intervenor defendants' motion to intervene. ECF No. 49. Shortly after, Wildgrass filed this amended complaint. ECF No. 65. State and intervenor defendants separately moved for summary judgment. ECF Nos. 67, 66.

## ANALYSIS

### A. **Justiciability**

#### 1. Ripeness

Intervenor defendants argue that the COGCC's decisions are not subject to this court's review because Wildgrass has not exhausted its state remedies by appealing the COGCC decisions in state court. ECF No. 66 at 8. However, "the settled rule is that 'exhaustion of state remedies 'is not a prerequisite to an action under [42 U.S.C.] § 1983.'" *Knick v. Twp. of Scott,*

*PA*, 139 S. Ct. 2162, 2167 (2019) (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994)).

Wildgrass need not have exhausted state remedies before bringing these claims.

2.  Standing

Intervenor defendants raise the issue of associational standing in a footnote.  "Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Defendants claim that "there are no allegations establishing that any of [Wildgrass'] members are nonconsenting owners, as opposed to merely mineral rights owners."  ECF No. 66 at 9 n.8.  They admit that if Wildgrass members are in fact non-consenting owners, they would meet the injury-in-fact requirement of standing.  *Id.*

At the temporary restraining order hearing before this Court on February 8, 2019, Wildgrass members testified that they had not signed the leases Extraction presented to them, and that the deadline to do so had passed, making them non-consenting owners under § 34-60-116.  Wildgrass members therefore have met the injury-in-fact requirement.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992).

3.  Political question

Intervenor defendants argue plaintiffs have brought "non-justiciable political question[s]" before this Court.  ECF No. 66 at 7.  A case involves a political question when it implicates

> a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).

According to defendants, to resolve this case I must decide the policy question of "whether fracking under the Pooling Statutes actually is good policy for achieving goals such as reducing waste and protecting mineral owners' rights." ECF No. 66 at 9. They also claim I must consider "whether fracking is consistent with the rule of capture" which requires "technical geological determinations regarding the differences between oil and gas obtained via fracking" as well as consideration of "broad policy questions regarding prevention of waste and protection of correlative rights that are not susceptible" to judicially manageable standards. *Id*. at 7–8.

None of defendants' arguments hold water. I am not asked to decide whether pooling or fracking is "good policy" but rather whether the statute violates the First Amendment, Contracts Clause, or Due Process Clause. The "technical geological determinations" defendants cite do not fit into any category of impermissible political questions. Nor am I required to decide "broad policy questions regarding prevention of waste and protection of correlative rights." To examine Wildgrass' claims I need not make any of my own policy determinations on waste prevention or protection of correlative rights in the context of fracking. Though at points in this opinion I do consider the state and public interest in those issues, I need not make any policy decisions myself. Therefore, I reject the argument that this case involves a nonjusticiable political question.

**B.  <u>Eleventh Amendment Immunity</u>**

The Eleventh Amendment of the United States Constitution bars claims brought in federal courts against states, state agencies, and state officials when sued in their official capacity for damages or retroactive relief. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). However, the Eleventh Amendment "does not bar a suit against state officials in their official

capacities if it seeks prospective relief for the officials' ongoing violation of federal law." *Harris v. Owens*, 264 F.3d 1282, 1290 (10th Cir. 2001). "Because an assertion of Eleventh Amendment immunity concerns the subject matter jurisdiction of the district court, [the Court] address[es] that issue before turning to the merits of the case." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).

State defendants argue that the Eleventh Amendment bars suit against Governor Polis because Governor Polis has no connection with enforcement of the act. ECF No. 67 at 14–15. "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). Defendants claim Governor Polis lacks a particular duty to enforce the statutory pooling provisions of the act, and that "granting any prospective relief against the Governor" would have no practical effect because "only the Commission issues pooling orders." ECF No. 67 at 15.

In Colorado, "when [the defendant] is an administrative agency, or the executive branch of government, or even the state itself, the Governor, in his official capacity, is a proper defendant because he is the state's chief executive. For litigation purposes, the Governor is the embodiment of the state." *Ainscough v. Owens*, 90 P.3d 851, 858 (Colo. 2004). Defendants argue that the Colorado Supreme Court limited the instances in which the Governor can be sued to those where he is the only available party. ECF No. 77 at 1 (citing *Developmental Pathways v. Ritter*, 178 P.3d 524 (Colo. 2008)). In *Developmental Pathways v. Ritter*, the Colorado Supreme Court upheld the governor as an appropriate defendant but noted that if the relevant

state commission had been in existence at the time the lawsuit was filed, they "may have reached a different conclusion." 178 P.3d at 529. Though the Court appears open to imposing such a limitation, they have not yet done so, and a survey of Colorado law shows a "long recognized practice of naming the governor, in his official role as the state's chief executive, as the proper defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy." *Cooke v. Hickenlooper*, No. 13-CV-01300-MSK-MJW, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016) (citing *Developmental Pathways*, 178 P.3d at 529); *see also Ainscough*, 90 P.3d at 858 (listing cases and noting that "[t]he variety of the cases illustrates how widespread and well-established this practice is").

Until the Colorado Supreme Court indicates more explicitly its intention to invalidate its longstanding practice, I will not do so. Therefore, I find Governor Polis in his official capacity is an appropriate defendant in this case.

### C. *Burford* Abstention

Both motions argue I should dismiss this case under *Burford* abstention, which "arises when a federal district court faces issues that involve complicated state regulatory schemes." *Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir. 1992) (citing *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)). Abstention doctrines are the exception and not the rule and should only be used "where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813–14 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959)). The Supreme Court has distilled the *Burford* abstention doctrine as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state

administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case the at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 361 (1989) (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 814) (internal quotations omitted).[1]

First, Wildgrass seeks declaratory and injunctive relief in its amended complaint. Therefore, this Court is sitting in equity for this action.

Second, timely and adequate state court review is available for Wildgrass' claims. Wildgrass argues that this Court is their only recourse because the COGCC is a state administrative agency and does not have authority to review federal constitutional claims. ECF No. 74 at 8. Though the agency itself may not be able to decide federal constitutional claims, the state courts certainly can review the constitutionality of COGCC decisions. COGCC decisions are subject to such review under the Colorado Administrative Procedure Act ("APA"), C.R.S. §§ 24-4-101 to -108 ("Any . . . final order of the commission shall be subject to judicial review in accordance with the provisions of section 24-4-106, C.R.S."). Other courts have found such state administrative review procedures to meet the *Burford* requirement of timely and adequate

---

[1] Until 1988, the leading test for *Burford* abstention in this circuit came from *Grimes v. Crown Life Insurance Company*, 857 F.2d 699, 704–05 (10th Cir.1988). Since 1988, however, the Supreme Court's ruling in *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 361 (1989), and *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996), have narrowed the test. The Tenth Circuit has affirmed that these two cases now define the scope of abstention under *Burford*. *See Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC*, 529 F. App'x 886, 897 (10th Cir. 2013) (unpublished) ("Since our decision in *Grimes*, the Supreme Court has narrowed application of the *Burford* abstention doctrine."). State defendants erroneously claim that *NOPSI* is inapplicable, arguing the *NOPSI* Court only considered abstention under *Younger v. Harris*, 401 U.S. 37 (1971). ECF No. 77 at 3. However, the *NOPSI* court also expressly declined to apply *Burford* abstention. *NOPSI*, 491 U.S. at 363. *NOPSI* has since become the main articulation of the *Burford* standard. *See Quackenbush*, 517 U.S. 706.

state court review.  *See, e.g.*, *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 422 (6th Cir. 2007); *Coal. for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1191 (6th Cir. 1995); *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 160 (4th Cir. 1993).  The state court system provides timely and adequate state court review of the COGCC decision.

Wildgrass has appealed several of the COGCC decisions under the Colorado APA in the Colorado state courts, demonstrating that timely and adequate state court review is available. Though Wildgrass does not raise the argument, I consider the import of Wildgrass's failure to raise some of the constitutional issues it brings here in its state appeal of the COGCC decision. Because Wildgrass did not appeal the decision within the statutorily prescribed time frame, Wildgrass may be unable to seek state court review.  The issue then is whether timely and adequate state court review is sufficiently "available" despite Wildgrass' failure to take advantage of it.  I find that it is.  Wildgrass' failure to pursue state court review cannot render review unavailable.  Otherwise review would be rendered unavailable at the convenience of the losing party, depending on whether they decided to seek it.  The availability and adequacy of state court review cannot be determined by Wildgrass' failure to pursue the remedies available to them.

Third, some claims in this case would require interference with state administrative agency proceedings and orders.  Wildgrass' procedural due process claims ask this court to consider whether the COGCC correctly exercised jurisdiction over Extraction's application for forced pooling.  Wildgrass argues that COGCC shouldn't have exercised jurisdiction because the forced pooling statute, which was grounded in the rule of capture, only applies to non-transient minerals.  To rule on these motions this Court would need to determine whether the COGCC complied with its own state statute by exercising jurisdiction.

The procedural due process arguments also hinge on whether the COGCC hearing process complied with the forced pooling statute. Wildgrass asks this court to consider not simply whether they had an opportunity to be heard, but whether that opportunity allowed them to present evidence on all the factors listed by the forced pooling statute. ECF No. 75 at 9–10. It appears that this is the type of case to which *Burford* abstention might apply if I conclude that it meets the other requirements listed in *New Orleans Public Services, Inc. v. Council of City of New Orleans (NOPSI)*.

Under *NOPSI* I first consider whether this case involves "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case the at bar." 491 U.S. at 361. In *NOPSI* the Supreme Court declined to abstain under *Burford* because the case did not involve either state law claims or federal claims "entangled in a skein of state-law that must be untangled before the federal case can proceed." *Id*. The Court stated:

> While *Burford* is concerned with protecting complex state administrative processes from undue federal influence, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy. . . . Unlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors, federal adjudication of this sort of pre-emption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an 'essentially local problem.'

*Id*. at 362.

This case, like *NOPSI*, does not involve state-law claims. Instead, Wildgrass brings constitutional challenges to the validity of the Colorado statute. Unlike *NOPSI*, however, Wildgrass' procedural due process claims ask this Court to examine the COGCC's application of the forced pooling statute to non-migratory minerals and consider whether the COGCC applied all the state-law factors when considering Extraction's application. This case therefore requires

the court to determine whether the COGCC had "misapplied its lawful authority or failed to take into consideration or properly weigh relevant state-law factors" of § 34-60-116. *Id.* Because evaluation of this claim would require evaluating the COGCC's longstanding methods of applying its own statute, it seems likely that federal adjudication of this sort of claim *would* disrupt the state of Colorado's attempt to ensure uniformity in the application of the forced pooling statute. *See id.*

In *Burford* itself the plaintiff brought a constitutional claim to challenge the reasonableness of a state agency's grant of an oil drilling permit. *Burford*, 319 U.S. at 333–34. The claim challenged the administrative proceeding in which the permit was granted. *Id.* Resolution of the case depended on review of the state agency's application of state-law factors and was therefore likely to create conflicts between federal and state courts' interpretation of state law. I see a similar risk here.

Other courts have counseled abstention when a claim appears to involve "state law in federal law clothing." *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 721 (4th Cir. 1999); *see also Browning–Ferris v. Baltimore County*, 774 F.2d 77 (4th Cir. 1985) (finding *Burford* abstention appropriate where federal claims under 42 U.S.C. § 1983 involved questions of local land use policy). In *Johnson v. Collins Entertainment Co.* the Fourth Circuit held that

> [n]avigating [state law] issues without definitive state court guidance brings federal courts into the treacherous waters of state political controversy. Even if the federal and state court systems happen to arrive at the same ultimate resolution on an issue of important state public policy, there is real value to allowing the states the first crack at deciding issues so pertinent to their own self-governance.

*Johnson*, 199 F.3d at 721.

Though Wildgrass asks me to determine whether § 34-60-116 is constitutional, in substance what it actually is asking is that I determine whether the COGCC correctly applied §

34-60-116.  Not only would I have to consider whether the COGCC correctly applied the statute in this particular instance, but whether the COGCC has previously approved and can continue to approve forced pooling for non-migratory mineral extraction, a question of state statutory interpretation that is difficult and controversial.  To me, this looks like a state law question in federal law clothing, one that would bring this court into an area of state political controversy and could easily create conflicts between state and federal interpretations.

This case also bears on policy problems of substantial public import.  In *Burford* the Court concluded that the drilling permitting process was "of vital interest to the general public," and that the state administrative structure was created to reflect that importance.  319 U.S. at 325. Colorado courts have frequently noted the importance of the state's oil and gas regulatory scheme.  *See, e.g.*, *City of Longmont v. Colo. Oil & Gas Ass'n*, 369 P.3d 573, 582 (Colo. 2016); *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 409 P.3d 637, 641 (Colo. Ct. App. 2016).  This importance is also reflected in the complexity of the Colorado oil and gas administrative processes.  *See* C.R.S. §§ 34-60-101 to -131.  As in *Burford* itself, the state of Colorado has established a comprehensive, though perhaps imperfect, regulatory scheme in order to address this issue of substantial public importance.  Significantly, this is further supported by the recent updates to the regulatory scheme extensively debated by both the public, the Colorado General Assembly, and the parties.  *See* 2019 Colo. Legis. Serv. Ch. 120 (S.B. 19-181) (West); *see also Grimes*, 857 F.2d 699 (finding that Oklahoma's "complex and comprehensive" insurer liquidation scheme counseled abstention); *First Penn-Pac. Life Ins. Co. v. Evans*, 304 F.3d 345, 349 (4th Cir. 2002) (finding rehabilitation and regulation of state savings and loan industry a matter of substantial state concern in the *Burford* abstention context); *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999) (finding regulation of gambling a "paramount" state

policy concern in the *Burford* abstention context); *Sugarloaf Citizens Ass'n v. Montgomery Cty., Md.*, 33 F.3d 52 (4th Cir. 1994) (noting that "questions of state and local land use law are 'classic' *Burford* situations").

I conclude that the importance of these policy problems and the state law questions "transcends" the importance of the case at hand. *NOPSI*, 491 U.S. at 361. The *Burford* court concluded that the due process constitutional claim was of "minimal federal importance, involving solely the question whether the commission had properly applied Texas' complex oil and gas conservation regulations." *NOPSI*, 491 U.S. at 360. Here, the procedural due process challenge similarly asks only whether the commission properly applied the statute. Answering this question would have far reaching consequences not on the federal level, but on the state level.

The case law provided by Wildgrass does not support its argument that *Burford* abstention is inappropriate. For example, Wildgrass cites *Alabama Public Service Commission v. Southern Railroad Co.*, for the proposition that "it was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it." 341 U.S. 341, 351 (1951). However, in that case the Supreme Court held that the district court should have abstained under *Burford* from reviewing the decision of a state commission on whether there was public need for purely intrastate railroad service. In *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), the Supreme Court did not consider abstention under *Burford*. In *Zablocki v. Redhail*, 434 U.S. 374 (1978), the Supreme Court rejected *Burford* abstention because the constitutionality of a state marriage statute did not involve "complex issues of state law, resolution of which would be disruptive to state efforts to establish a coherent policy." 434 U.S. at 677 n.5.

In sum, I conclude that Wildgrass' procedural due process claims fit the first *NOPSI* category. I therefore find it appropriate to discretionarily abstain from deciding Wildgrass' procedural due process claims under *Burford*.

Wildgrass' other claims, however, do not meet all these criteria. Specifically, it is not clear that the other claims would require me to wade into the state administrative process and decide complex issues of state law in the manner that the procedural claims would. Because abstention is a rare exception that should be sparingly applied, *Colo. River Water Conservation Dist.*, 424 U.S. at 813–14, I decline to abstain on the remaining claims and proceed to consider defendants' other arguments for dismissal.

**D.  <u>Failure to State a Claim</u>**

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts must accept well-pled allegations as true, purely conclusory statements are not entitled to this presumption. *Id.* at 678, 681. Therefore, so long as the plaintiff pleads sufficient factual allegations such that the right to relief crosses "the line from conceivable to plausible," she has met the threshold pleading standard. *Twombly*, 550 U.S. at 556, 570.

1.  <u>First Amendment Claims</u>

Wildgrass argues that forced pooling violates the First Amendment in two distinct ways. First, Wildgrass argues that forced pooling requires non-consenting mineral owners to "associate" with oil and gas companies. Second, Wildgrass argues that forced pooling compels

them to "subsidize private speech" of oil and gas companies.  ECF No. 54 at 22–23.  I address each argument in turn.

### a. Association

"Freedom of association . . . plainly presupposes a freedom not to associate."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  "The right to eschew association for expressive purposes is likewise protected."  *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448 (2018) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

Plaintiffs argue that the forced pooling statute requires them to associate with oil and gas companies through "compulsory monetary contribution."  ECF No. 74 at 15.  Defendants argue that Wildgrass has not alleged that the forced pooling statute requires association for expressive purposes.  ECF No. 66 at 13–14.

The expressive purpose of the alleged compelled association is attenuated and theoretical. According to Wildgrass, the forced pooling statute forces them to associate with oil and gas companies who "will likely use at least some of the compelled payments to participate in advertising and political speech by industry advocacy groups . . . , speech which may be highly offensive to Plaintiff."  ECF No. 74 at 16.

It is worth noting that non-consenting mineral owners do not pay the drilling operators. Rather the operators are entitled to recoup non-consenting owner's operating costs from their share of the profits.  However, even if this recoupment scheme could be viewed as compelled association, that association cannot be said to be "for expressive purposes."  There is no evidence that the operators' recovery is used for expressive purposes, as opposed to what it is expressly meant to compensate, namely operators' operating costs.  Though it is true that oil and gas companies engage in political speech, this speech is too disconnected from the forced pooling

scheme to find that the force pooled members are associated with the oil and gas companies for expressive purposes.

The Supreme Court's "case law recognizes radically different constitutional protections for expressive and nonexpressive associations." *Roberts*, 468 U.S. at 638 (O'Connor, J, concurring) (listing cases distinguishing purely expressive and purely commercial associations). Though the Court acknowledges that associations are often mixed, there is no evidence here that any association among Wildgrass owners and oil and gas operators is in any way expressive. Almost all expressive association cases involve groups formed for associational purposes—for example, boy scout troops (*see Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)) or religious organizations (*see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995))—who challenge a requirement that they associate with certain types of individuals. Wildgrass has not cited, nor have I unearthed, any case remotely similar to the situation here, in which individual property owners feel they have been compelled to associate with oil and gas operators who have been given permission by the state to extract their minerals.

The forced pooling statute is also distinguishable from the other associational cases Wildgrass cited. Wildgrass relies primarily on *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, a recent decision in which the Supreme Court found that forced contribution to a labor union violated the First Amendment. 138 S. Ct. 2448, 2464 (2018). In *Janus*, the union dues funded the union's representation of employees in the collective bargaining process. *Id.* at 2460. The Court found that in negotiations with employers, "the union speaks for the employees," and that the government did not have a sufficiently compelling interest in requiring all employees to support that speech. *Id.* at 2468.

This case looks quite different.  The forced pooling statute does not exist as a mechanism for funding speech like the union dues scheme in *Janus*.  Rather it exists, as Wildgrass notes, to overcome wasteful and unfair drilling practices that result from the rule of capture.  ECF No. 54 at 6–7.  That some drilling companies who apply to the COGCC for forced pooling permission will later engage in political speech with which Wildgrass disagrees does not turn the statute into one compelling association for expressive purposes.  Wildgrass has not raised a genuine dispute regarding whether they have been forced to associate for expressive purposes.

  b.  Subsidizing Private Speech

"Compelling a person to subsidize the speech of other private speakers raises [] First Amendment concerns."  *Janus*, 138 S. Ct. at 2464.

Wildgrass claims that just as the statute requires non-consenting owners to associate with oil and gas companies, it also requires them to subsidize the oil and gas companies' speech.  ECF No. 75 at 15.  Wildgrass again relies on *Janus* to support its theory.  As discussed above, this reliance is misplaced.  In *Janus*, non-union member employees were required to pay dues that would directly fund union speech in collective bargaining.  138 S. Ct. at 2464.  Here, just as in the association claim, the connection between the statute and the alleged speech that Wildgrass claims it must subsidize is too attenuated.  The forced pooling statute is not aimed at and does not fund speech.  Though some forced pooling applicants may engage in speech the Wildgrass owners disapprove of, the statutory recoupment scheme does not serve to fund this.

Because the statute does not compel association nor subsidization of private speech, I must dismiss the first amendment claim in its entirety.

  2.  Substantive Due Process

Wildgrass argues that the forced pooling statute violates their substantive due process rights because (a) it forces them to associate with oil and gas operators, (b) it is unreasonably vague, and (c) it constitutes a taking for purely private use. ECF No. 75 at 10–14. I address each argument in turn.

a. Freedom of Association

Wildgrass bases this freedom of association challenge on the same allegations as its First Amendment freedom of association claim, namely that Wildgrass members are forced to associate with oil and gas operators "for expressive purposes." ECF No. 75. Wildgrass is correct that freedom to associate or not to associate "for the advancement of political beliefs" is a fundamental right. *Illinois State Bd. of Elections v. Socialist Worker's Party*, 440 U.S. 173, 184 (1979).

However, Wildgrass has not shown that the forced pooling statute requires them to associate for the advancement of political beliefs. Though forced pooling does require Wildgrass owners to interact on some level with oil and gas operators, there is no evidence it requires them to associate with such operators for the advancement of either party's political beliefs. Like their First Amendment freedom of association claim, Wildgrass fails to show that forced pooling forces them to associate for an impermissible reason, such as for an expressive purpose with which they disagree.

b. Vagueness

Wildgrass claims the forced pooling statute is vague because it does not define what constitutes a "reasonable offer" under § 34-60-116(7)(d)(I). ECF No. 74 at 12–13.

"There are two possible, and independent, reasons a statute may be so vague it constitutes a Fourteenth Amendment violation: First, if it fails to provide people of ordinary intelligence a

reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even

encourages arbitrary and discriminatory enforcement." *Faustin v. City & Cty. of Denver, Colo.*,

423 F.3d 1192, 1201–02 (10th Cir. 2005) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2002))

(internal quotations omitted). The first scenario does not apply: The forced pooling statute is not

of the type that prohibits conduct and could create a due process violation by preventing ordinary

individuals from knowing what conduct is prohibited. Wildgrass must therefore allege sufficient

facts to show that the statute authorizes or encourages arbitrary or discriminatory enforcement.

Even assuming that "reasonable offer" is a vague term, the statute itself provides

guidance for enforcement and allows the COGCC to further define reasonableness, which the

COGCC has done. The provision in question states that a reasonable lease offer includes "terms

no less favorable than those currently prevailing in the area at the time application for the order

is made." § 34-60-116(7)(d)(I). This establishes a standard through which the COGCC can

evaluate the reasonableness of leases. The statute further states that the COGCC "retains

jurisdiction to determine the reasonableness of costs" attributable to non-consenting owners. *Id.*

The COGCC has codified its method of making this determination in its Rule 530, which

requires the commission to consider the offered lease terms in comparison with other leases

offered in the spacing unit and all adjacent units. 2 Colo. Code Regs. 404-1, Rule 530(c)(2).

From this, I must conclude that statute does not authorize arbitrary enforcement and its therefore

not facially vague.

Wildgrass has another related argument. It asserts that regardless of the statute's

provisions, and despite clarification in a rule, the COGCC commissioners themselves were

unclear what criteria should be used to define a reasonable offer. ECF No. 65 at 20. In

particular one commissioner stated that

[t]he statute and the rule are not at all clear. There has to be an offer to lease on reasonable terms. How do you define "reasonable" and whose burden is it to produce evidence of reasonableness? Does Extraction have to support its offer to each mineral owner by providing evidence of leases and bonuses paid all around the area, or is it up to the owner to satisfy itself what the going rate is or at least to raise an objection or a concern and see if extraction will then provide additional detail? The statute and the rule are not at all clear.

*Id*.

Wildgrass' argument, though insufficient to show vagueness under substantive due process, does state a procedural due process issue. Namely, it asserts that Wildgrass was denied a meaningful opportunity to be heard because, given the commissioners' own confusion about the statutory criteria, Wildgrass could not know what factors would be considered at the hearing, and therefore could not prepare for it. *See, e.g.*, *Citizens Allied for Integrity & Accountability, Inc. v. Schultz*, 335 F. Supp. 3d 1216, 1227 (D. Idaho 2018) (finding plaintiffs were denied meaningful opportunity to be heard because they did not and could not know under what standard the commission would evaluate "just and reasonable" lease terms).

However, as a procedural due process argument, this claim falls prey to the same *Burford* abstention issues as Wildgrass' other procedural due process arguments. Specifically, it would require this Court to rule on whether Wildgrass had the opportunity to be heard in light of the commissioners' application of the statutory reasonable lease offer requirement. As such, this claim is similarly dismissed under *Burford* abstention.

      c.   <u>Taking</u>

Wildgrass argues that forced pooling allows the government to take non-consenting owners' private property not for a public purpose but to bestow a benefit on private oil and gas operators, violating the Takings Clause. ECF No. 74 at 13–14. "Purely private" takings violate

the "public use requirement" of the Takings Clause.  *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984).

Preliminarily, I dispatch with defendants' argument that because Wildgrass has not pursued remedies at the state level, it has not appropriately exhausted its administrative remedies for a takings claim as required under *Gamble v. Eau Claire County*, 5 F.3d 285, 286 (7th Cir. 1993).  Even assuming that *Gamble*, a Seventh Circuit opinion, established the requirements to state a takings claim in this circuit, defendants' argument is misplaced.  The court in *Gamble* found that a plaintiff claiming lack of just compensation for a taking must first pursue compensation through all available state remedies because "[u]ntil then he cannot know whether he has suffered the only type of harm for which the just-compensation provision of the Constitution entitles him to a remedy."  Unlike in *Gamble*, Wildgrass' claim is not that it has received inappropriate compensation for a taking.  Rather it argues that the taking itself is unconstitutional because it does not serve a public purpose.  ECF No. 74 at 13–14.  Therefore *Gamble* is inapplicable.

To show a taking, Wildgrass must show a property interest, which in turn is determined by state law.  *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010); *see also Kerns v. Chesapeake Expl., L.L.C.*, 762 F. App'x 289, 296 (6th Cir.) (unpublished), *cert. denied*, 139 S. Ct. 2033 (2019) (examining Ohio state law to determine whether statutory forced pooling implicated a property interest).  In Colorado, like in Ohio, oil and gas underlying the property surface are part of a property estate.  *OXY USA Inc. v. Mesa Cty. Bd. of Commissioners*, 405 P.3d 1142, 1144 (Colo. 2017).  Also like Ohio, Colorado recognizes property owners' "correlative rights" in obtaining "a just and equitable profit share" from a "common source or pool" of such resources while preventing waste.  *City of Longmont*, 369 P.3d

at 580–84 (quoting C.R.S. § 34–60–102(1)(b)).  Thus, Colorado landowners have both property

interests in the subsurface minerals and an "attendant right to recover those minerals without

needless waste."  *Kerns*, 762 F. App'x at 296.

The next question is whether the taking of the property interest serves a public purpose or

merely conveys a private benefit.  The Supreme Court has routinely found it within state police

powers to regulate oil and gas in similar manners in order to serve the public interests in curbing

waste, protecting correlative rights, and protecting the economy of the state.  *See Cities Serv.*

*Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 185 (1950) (citing *Champlin Refining Co. v.*

*Corporation Commission*, 1932, 286 U.S. 210 (1932), *Railroad Commission of Texas v. Rowan*

*& Nichols Oil Co.*, 310 U.S. 573 (1940)) ("This Court has upheld numerous kinds of state

legislation designed to curb waste of natural resources and to protect the correlative rights of

owners through ratable taking . . . or to protect the economy of the state."); *see also Kerns*, 762

F. App'x at 296 (collecting cases).  Wildgrass has not provided any case law suggesting that

these binding precedents should be ignored or should not apply to this statute.  Forced pooling

thus serves a public purpose.  Accordingly, although Wildgrass has shown the existence of a

property interest, it has not shown that the taking of such property interest does not serve a public

purpose.

3.  Contract Clause

Wildgrass argues that the forced pooling statute violates the Contract Clause because it

does not require mutual consent and creates an involuntary contract.  ECF No. 74 at 18–20.

In a Contracts Clause case, "[t]he threshold inquiry is whether the state law has, in fact,

operated as a substantial impairment of a contractual relationship."  *Energy Reserves Grp., Inc.*

*v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (quoting *Allied Structural Steel Co. v.*

*Spannaus*, 438 U.S. 234, 244 (1978)) (internal quotations omitted). Therefore, to violate the contracts clause there must be an existing contractual relationship that the statute substantially impairs. *Id.*

Wildgrass nowhere argues that there exists a preexisting contract that the forced pooling statute impairs. Instead, Wildgrass argues that the statute "creates a statutory contract between the non-consenting landowner and oil operator." ECF No. 75 at 18. Wildgrass provides no support for this statement but cites to cases in which a preexisting contract was altered by a statute. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 451 (1985).

The Supreme Court has firmly established that to create a "statutory contract," a legislature must "clearly and unequivocally express[]" intent to do so. *Atchison*, 470 U.S. at 465–66. The Colorado Court of Appeals has held that no contract exists between operators and non-consenting owners force pooled under § 34–60–116. *See Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 409 P.3d 637, 643 (Colo. Ct. App. 2016).

The Colorado Court of Appeals finding does not bind me but is persuasive on the issue of the Colorado General Assembly's intent. In *Grant Bros. Ranch, LLC v. Antero Resources Piceance Corp.*, the Colorado Court of Appeals examined in detail the legislative intent behind the forced pooling statute and found that a contract did not exist between operators and non-consenting owners. 409 P.3d at 643. In my own reading of the statute I similarly find no clear indication of intent to create a contract between operators and non-consenting owners. *See* § 34-60-116.

Wildgrass also draws an analogy between the Contracts Clause and "Commerce Clause cases" in which "the Court has rejected laws granting federal administrative agencies the power

to compel contractual relationships between parties." ECF No. 75 at 18. But as Wildgrass itself states, these cases revolve around the scope of the federal interstate commerce power, not the limitations on legislatures imposed by the Contracts Clause. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebeliu*s, 567 U.S. 519, 552 (2012). Here, the issue is whether the state of Colorado violated the Contracts Clause through exercise of its police powers, not whether the federal government has over-extended its interstate commerce power. I conclude that it has not and therefore the Contracts Clause claim must be dismissed.

## CONCLUSION

The substance of this case involves important questions of state law, and the jurisdiction of a state administrative agency applying that law. Although I recognize the sincerety of the plaintiff's concerns, I conclude that a federal court is not the appropriate forum to resolve these questions. Therefore, I dismiss Wildgrass' procedural due process claims under *Burford* abstention. Wildgrass' other claims bear less weight, and I find that Wildgrass has failed to state a substantive due process claim, a Contracts Clause claim, or a First Amendment claim, and therefore those claims must be dismissed.

**ORDER**

Defendants' motions to dismiss Plaintiff's First Amended Complaint [ECF Nos. 66 and 67] are granted. This case is dismissed with prejudice. As the prevailing parties, defendants are awarded their reasonable costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 18th day of March, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge